**TEXAS AND NEW ORLEANS RAILROAD COMPANY, Plaintiff,**

v.

**CITY OF NEW ORLEANS By and Through the PUBLIC BELT RAILROAD COMMISSION FOR THE CITY OF NEW ORLEANS, Defendant,**

**Texas Pacific–Missouri Pacific Terminal Railroad of New Orleans, Intervenor.**

**Civ. A. No. 7188.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 1, 1960.

Supplemental Opinion June 24, 1960.

Chaffe, McCall, Phillips, Burke & Hopkins, Harry McCall, Jr., New Orleans, La., for plaintiff.

Dufour, St. Paul, Levy & Marx, John St. Paul, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, A. J. Waechter, Jr., L. J. Darrah, New Orleans, La., for defendant.

Phelps, Dunbar, Marks, Claverie & Sims, Jack M. Gordon, New Orleans, La., J. T. Suggs, Dallas, Tex., for intervenor.

**J. SKELLY WRIGHT, District Judge.**

This declaratory action seeks an interpretation of one of several related contracts concerning the financing, construction and operation of the Huey P. Long Bridge across the Mississippi River just above New Orleans. Defendant ("Belt") is the owner of the bridge; plaintiff ("T&NO") was originally the only user of the bridge, except for Belt itself; and intervenor ("Terminal") is now the other user, along with T&NO and Belt. Under the agreements, T&NO makes regular fixed payments to Belt for the use of the bridge and portions of Belt's tracks. It is conceded by all parties that these rentals will be substantially reduced upon the occurrence of certain contingencies. The whole controversy results from a disagreement between the parties as to exactly what these contingencies are. While Terminal is in a position similar to T&NO, there is no dispute as to the conditions which must be met before its bridge rentals are reduced.[1] However, because the time when those conditions will be fulfilled in large measure depends on the continuance of fixed payments by T&NO, Terminal has an interest in postponing the date on which T&NO begins to pay a lesser rental and, quite naturally, takes Belt's side in these proceedings.[2]

The pertinent facts are not in dispute; the applicable law is elementary;[3] and the basic issue is a narrow one. But, in spite of its apparent simplicity, the controversy presents very difficult questions of interpretation, complicated by highly technical financing arrangements. The chief offenders are the contracts themselves. Taken alone, each is prolix in the extreme, stuffed to overflowing with surplusage, redundancies, and even contradictions. Read together, as they must be, the agreements suggest a persistent and deliberate effort to avoid clarity in favor of intricate complexity. The result is a huge dark labyrinth, from which, even with sturdy limbs, a stout heart, and an alert mind, it is almost impossible to find the exit before tiring and losing the thread, assuming there is one. Even the able and exhaustive argument of all counsel in the case has not

---

1. At present, it appears that Terminal's fixed bridge rentals are actually *less* than they would be on user basis. But this was not the case when the suit was filed and is, admittedly, only a temporary situation. In the long run it seems clear that Terminal will pay less on the user basis and that its interest is to advance user date.

2. Except as to certain questions under "Contingency (a)," which, as later noted, is no longer applicable.
   Terminal's interest is discussed in an earlier opinion granting its motion to intervene. D.C., 22 F.R.D. 84.

3. See LSA–C.C. Articles 1945–1962.

fully clarified the confused picture. In this situation, it will be necessary to paint in the full background [4] and examine each of the contracts in some detail.

In 1932, pursuant to previous Congressional authorization [5] and under conditions outlined in Amendments of the Louisiana Constitution,[6] Belt and the State [7] committed themselves to build the bridge in a comprehensive contract with T&NO ("First Bridge Contract"). The State of Louisiana contributed seven million dollars toward the cost of construction and the balance, originally estimated to be another seven million dollars, was to be raised by Belt through a bond issue which the Reconstruction Finance Corporation agreed to purchase. As part of a contemporaneous agreement ("First Track Contract"), Belt agreed to extend and improve its track facilities leading to the bridge at its own expense and make certain portions available to T&NO. Under these contracts, as soon as the bridge became usable ("Operation Date"), T&NO, the prospective user, was to begin making fixed payments which, though separately stated and nominally charged for use of the bridge and of Belt's tracks, respectively, were actually calculated to total an amount sufficient to pay the annual cost of servicing the bonded indebtedness.[8] As already noted, these payments were to be reduced to more realistic rentals ("pro rata share of Agreed Bridge and Track Charges" or "User Basis") upon the occurrence of certain contingencies ("User Date" or

"Date of Cessation of Fixed Payments"). As it had agreed to do, Belt thereupon pledged and assigned its anticipated bridge revenues to the Hibernia Bank as trustee for the bondholders (the "Indenture"). Though not obligated to do so under its contract with T&NO, Belt also pledged and assigned revenues received for the use of its tracks, including the payments by T&NO under the First Track Contract, and, as further security, mortgaged to the trustee the bridge itself, its approaches, and certain adjacent lands. Under the Indenture, the bank was to collect all receipts and make all disbursements connected with the financing, construction, maintenance and operation of the bridge, until all bonds were retired.

Contrary to more recent experience in the area of public works, the cost of constructing the bridge was somewhat less than had been anticipated and only $6,000,000 of Belt's bonds were actually issued. Since interest costs were thus lowered, the amount of the fixed payments T&NO was to make was accordingly reduced under a formula provided in the First Bridge Contract. As Operation Date approached, no other railroad having contracted for use of the bridge, it became clear that T&NO would be the sole user, except for Belt itself. This was apparently a disappointment to the parties. In any event it required certain changes in the allocation of the funds in the hands of the trustee ("Second Sup-

4. Some of the background is given by the Court of Appeals in its opinion deciding an earlier controversy between Belt and T&NO, City of New Orleans v. Texas & N. O. R. Co., 5 Cir., 195 F.2d 882, 884–885. See also, City of New Orleans v. Texas & Pac. Ry. Co., 5 Cir., 195 F.2d 887, 888–889.

5. Acts of April 17, 1924, 43 Stat. 103; May 24, 1928, 45 Stat. 732, and Feb. 10, 1932, 47 Stat. 44.

6. Act 154 of 1928, adopted Nov. 6, 1928, amending La.Const.1921, Art. XIV, Sec. 28–LSA; Act 3 of 1930 Ex. Sess., adopted Nov. 4, 1930, amending La.Const.1921, Art. VI, Sec. 22.

7. The State's primary interest was, and is, in the highway section of the bridge, which is maintained by the Highway Department with its own funds. Only the railroad section is involved in this controversy.

8. T&NO, and now Terminal, also pay a "Bridge Arbitrary" of $2.00 per equated car which, during the life of the Indenture, was turned over to the Trustee and used originally to defray maintenance costs. These payments, however, continue beyond User Date for the entire life of the contracts and are not involved in this controversy.

plemental Indenture").[9] The bridge was opened to railroad traffic on December 17, 1935.

In 1940 Terminal finally decided to abandon its ferry operation across the river and use the new bridge. After the terms of the contracts between Belt and Terminal had been settled, T&NO and Belt entered into an agreement designed to adapt the First Bridge and Track Contracts to the arrival of this new user ("Amending Agreement"). Within a few weeks, the contracts between Belt and Terminal were formalized ("Second Bridge Contract" and "Second Track Contract"). The Second Bridge Contract provided for payments by Terminal of arbitrary amounts ($100,000 per annum for first seven years; $150,000 thereafter) [10] until certain refunds specified in the Amending Agreement had been made to Belt and T&NO, whereupon Terminal was to be on "user basis." Terminal's payments for use of Belt's *tracks*, however, were, from the beginning, calculated on user basis.[11] In accordance with the provisions of the original Indenture, these rentals were to be paid over to the trustee. Terminal actually began using the bridge and tracks, and making the stipulated rental payments, on July 5, 1942.

Because of the additional revenues provided by Terminal, the trustee was able to retire most of the bonds before maturity and make certain of the refunds to T&NO and Belt stipulated in the Indenture. By October 1, 1955, there remained only $100,000 outstanding, all in bonds maturing in 1982. Though not obligated to do so, Belt chose to have these bonds called, and on April 1, 1957, the Indenture fell.

This much is clear enough. It is also conceded that, provided sufficient funds became available, Belt was to be reimbursed some of the monies it contributed, and that T&NO would be refunded its excess track payments ("Track Advances").[12] All refunds to which T&NO is entitled having been made, or being on a current basis, the question is narrowed to those due Belt. Even here, the argument is not so much *what* is due, but *when* it becomes due, whether *before* or *after* T&NO goes on user basis. Belt is concerned that T&NO should continue making fixed payments until all refunds are completed only because, with *both* T&NO and Terminal contributing, it will get its money *faster* than if the refunds were taken only from Terminal's inflated bridge rentals. Since Terminal's going on user basis is dependent on the completion of all refunds to Belt, it naturally prefers to have T&NO share the obligation by continuing to make fixed payments, thus hastening the date when it can itself enjoy reduced bridge rates. In the final analysis, this comes down to deciding whether Terminal alone will furnish the monies to make the remaining refunds to Belt, or whether T&NO shall contribute.

T&NO invokes alternatively both of the provisions of the First Bridge Contract specifying the conditions under which it may cease to make fixed payments and go on user basis, but primary reliance is placed on what is called "Contingency ('b')," the requirements of which it claims have long since been satisfied. In the words of Section 7 of the

9. There had been a "First Supplemental Indenture," the terms of which are unimportant to this case.

   The Second Supplemental Indenture also incorporated an agreement by the RFC, as holder of the bonds, to reduce the interest rate from 5% to 4%.

10. In addition to the $2.00 per car "Bridge Arbitrary." See Note 8, supra.

11. So far as Terminal's payments for the use of Belt's tracks are concerned, the

only change is that, after its *bridge* payments are reduced to user basis, the calculation of its pro rata share of track charges will be made monthly rather than semi-annually.

12. I. e., the difference between its pro rata share of "Agreed" or "Basic Track Charges" and the amount actually paid through the arbitrary fixed track rentals. This excess is characterized as a "loan" or "advance" by T&NO to Belt.

First Bridge Contract, that contingency occurs when:

"* * * the obligations of 'Public Belt' under said mortgage and/or trust deed and under all bonds issued thereunder shall have in all respects been fully paid, discharged and satisfied and there shall have been refunded by said Trustee and/or 'Company' to 'Public Belt' with interest at the rate of 5% per annum from the respective dates on which the same were expended, paid, or retained, as the case may be, to the respective dates on which refunded to 'Public Belt', all sums which

"(1) 'Public Belt' has expended prior to the date of this contract upon the cost of the bridge and approaches not refunded to it out of the proceeds of said bonds, the amount of this item (1) with interest to the Operation Date not to exceed the sum of Five Hundred and Seventy-five Thousand Dollars ($575,000),

"(2) 'Public Belt' has from its own funds (not including any proceeds from said bonds nor any 'advances' by 'Company' under Track Contract) paid to said Trustee to discharge the obligations of 'Public Belt' under said bonds and said mortgage and/or trust deed, and

"(3) have been retained by said Trustee to discharge the obligations of 'Public Belt' under said bonds and said mortgage and/or trust deed out of revenues paid by parties other than 'Company' for the use of said bridge and approaches and/or the tracks of 'Public Belt' referred to in the Track Contract, * * *"

The Indenture having been satisfied, the question is what refunds are called for by this provision. Item (1), it is agreed, refers to Belt's "preliminary expenses."[13] But as to what is included under Items (2) and (3), there is almost complete disagreement. Though all parties read "own funds" in (2) to mean monies Belt could have retained for its own use, but voluntarily contributed to the bridge, they do not understand "voluntarily" in the same way. Belt says the contribution of the "Basic Track Charges" paid by T&NO was voluntary because it did not obligate itself *to T&NO* to so use them in the First Track Contract. T&NO, on the other hand, claims the assignment of these revenues was *not* voluntary because, *under the Indenture*, Belt was bound to assign them. Plausible arguments are advanced in support of both contentions, but, unfortunately, they cancel each other out. Thus, T&NO's best weapon is the reductio ad absurdum by which it demonstrates convincingly that a broad reading of "own funds" leads to very improbable results, while Belt offers an apparent "clincher" in pointing to the specific exclusion of T&NO track "advances" from Item (2) by the parenthetical clause, which certainly can be read as implying that "basic" track charges *are* part of Belt's "own funds" contributed to the bridge. The wording is ambiguous and looking only at the text it is impossible to award the victory to either side.

Item (3) of Contingency (b) presents even more difficult problems. Read literally, it seems to require refund to Belt of all amounts paid directly to the trustee by users of the bridge and tracks other than T&NO and used ("retained") to defray bridge costs. That would include all of Terminal's bridge rentals as well as its track payments. Belt accepts this reading, but very generously waives reimbursement of Terminal's *bridge* payments, limiting its claim under this provision to refund of Terminal's *track* rentals paid over to the trustee. Belt now takes this position, it says, because it has always done so, and feels it improper suddenly to inflate its claim. Such noble motives are, of course, com-

---

13. As the text of subdivision "(1)" quoted above makes clear, these are the sums Belt expended for the bridge from its own pocket before the First Bridge and Track Contracts were executed, and before the Indenture.

mendable, but it must be pointed out that a broader claim would, as a practical matter, render Contingency (b) almost impossible of fulfillment. Thus, in order to derive some benefit from the provision without turning it into an ' absurdity, Belt is forced to make an awkward compromise.

T&NO, for its part, indulges in semantic niceties that yield a different result, much neater, but no surer. Its position is that the only Terminal monies refundable to Belt under Item (3) are those which the trustee *used to pay bond interest and principal*, as opposed to those allocated to construction or maintenance. . That interpretation is achieved by reading the phrase "obligations of 'Public Belt' under said bonds and said mortgage and/or trust deed" [14] to mean only those obligations arising under *both* the bonds and the mortgage. But this is clearly straining. In effect, it deletes the words "and said mortgage and/or trust."

Enough has been said to demonstrate that the provisions of Contingency (b) of the First Bridge Contract are ambiguous when read alone. Clearly, some aid to construction is appropriate. As already noted, reference to the Indenture is made by both parties, but, while each can gain some comfort from that instrument, it does not resolve the basic conflict. The Indenture does provide for refund to Belt of the specific items it claims, notably T&NO and Terminal's basic track charges, regardless of the use made of these payments by the trustee. But there is no indication that these refunds, to be effected only if and when sufficient monies became available during the life of the Indenture, were intended to correspond to Items (2) and (3) in the First Bridge Contract. On the contrary, the trustee's refunds, unlike those stipulated in the Bridge Contract, are without interest. Moreover, the Indenture also provides for reimbursement of other unpledged monies Belt might have voluntarily contributed,

which may well be the "own funds" of Item (2), as T&NO contends.

The parties also resort to the Amending Agreement of 1940 for clarification of the provisions of Contingency (b). Belt claims to find in the definition of "Belt Advances" in Article II of the later agreement a detailed recapitulation of items (1), (2), and (3). Despite minor difficulties, this solution is momentarily tempting. But a glaring flaw appears as soon as we realize that under the Amending Agreement "Belt Advances" are by definition contributions for which Belt may reimburse itself *after user date*, largely out of Terminal's excess bridge payments. Obviously, then, they cannot be the same amounts which *T&NO* is bound to refund to Belt *before* going on user basis under Contingency (b) of the First Bridge Contract. Nor does the Amending Agreement contemplate that any part of Belt Advances will already have been repaid *by T&NO under the Bridge Contract,* the only provision being for reducing the refund due by the amount received *from the trustee under the Indenture*. As T&NO belatedly argues, the inclusion under Belt Advances of. the items claimed by Belt indicates the opposite conclusion that these refunds are *not* a condition precedent to T&NO's ceasing fixed payments, but become due only after user date. Thus, T&NO's narrow reading of Items (2) and (3) of Contingency (b) seems justified. But, unfortunately, there remains a conflict between the provisions of Item (1) in the original Bridge Contract which requires refund of Belt's *preliminary expenses* before user date and the disposition of the Amending Agreement that these expenses, admittedly a part of "Belt Advances" as there defined (Items "(g)" and "(h)"), shall be reimbursed after T&NO goes on user basis.

Belt attempts to avoid the force of the Amending Agreement's provision for refunds *after* user date by arguing that it was intended to apply only in the event T&NO goes on user basis under Con-

---

14. T&NO makes the same argument with reference to Item (2) which contains the same language.

tingency (*a*) which, as later discussed, contemplates that the Indenture is still in effect and the refunds have not yet been made. Since, on the other hand, Belt uses the provision to bolster its interpretation of the refunds due under Contingency (*b*), this approach might be criticized as an attempt by Belt to have its cake and eat it. But, more important, the suggested limitation of Article II of the Amending Agreement is directly contradicted by the language of the provision. Indeed, the text clearly refers to the Date of Cessation of Fixed Payments as *following* the fall of the Indenture, a situation which, in Belt's view at least, can only occur when T&NO achieves user basis under Contingency (b). Moreover, unwilling to forego its claim to reimbursement of 6% of the amount of "additions and betterments" which is mentioned only in the Amending Agreement (Item "k"), Belt is compelled to say that these refund provisions are "partially" applicable even if T&NO goes on user basis under Contingency (b). But since nothing authorizes such a "fractional" treatment of Belt Advances, this might be taken as an admission that Article II of the Amending Agreement is fully effective under the circumstances envisaged by Contingency (b) of the Bridge Contract.

Despite contrary claims, we must conclude that the Amending Agreement does not clarify the refund provisions of the First Bridge Contract. To the contrary, a close examination reveals an irreconcilable conflict between the later agreement and all suggested readings of Contingency (b) in the original contract. The obvious solution to this impasse would seem to be to consider the Amending Agreement as superseding or amending the inconsistent provisions of the Bridge Contract.[15] But none of the parties has even hinted at such a radical cure, and that fact alone suggests caution.[16] Nor is that all. There are stronger independent reasons for doubt. In the first place, the refund provisions of the Amending Agreement are by their own terms applicable only when T&NO's fixed payments cease "pursuant to Section 7 of the First Bridge Contract," which, as already noted, presumably means *after* the conditions of Contingency (b) as set forth in the original contract have been satisfied. Moreover, Article XIV of the Amending Agreement provides that "Except as hereinabove expressly amended, the First Bridge Contract and the First Track Contract shall be and remain as written," and the relevant portion of the First Bridge Contract is not *explicitly* changed by any provision of the amending instrument. Accordingly, what seemed the only method of reconciling the agreements must also be rejected.

Discouraging as it may be, this court is compelled to the conclusion that the question presented cannot be decided solely by reference to the relevant contracts. In the circumstances, resort must be made to extraneous indications of the intent of the parties.

Besides the contracts themselves, the documentary evidence consists of joint calculations and correspondence between the parties. Until 1945, the exhibits uniformly show refunds to Belt of T&NO Basic Track Charges without interest, in conformity with the Indenture,[17] the pertinent provision of which is often cited as authority for the refund. T&NO attempts to read in this an admission by

---

15. Read together with the Second Bridge and Track Contracts, the Amending Agreement might be read to "transfer" to Terminal T&NO's former refund obligations under Contingency (b) of the First Bridge Contract.

16. Though the court specifically invited counsel to discuss the inconsistencies, if any, between the two agreements, and suggest how they should be resolved, all parties took the position that there was no conflict.

17. It is conceded by all parties that the refund of T&NO and Terminal Basic Track Charges to Belt under the Indenture was without interest, while the same refund, if included in Items (2) and (3) of Contingency (b) in the First Bridge Contract, is there stipulated to be with interest at 5%.

Belt that the refunds were due only under the Indenture and not under Contingency (b) of the First Bridge Contract, which provides interest on all refunds. But no such inference is justified, for, as Belt points out, the occurrence of Contingency (b) then seemed improbable, or, at least, very distant, and the parties were more concerned with their already matured claims under the Indenture.[18] On the other hand, T&NO's admission during that period that Belt was entitled to reimbursement, albeit without interest, for the Basic Track Charges paid over to the trustee is no indication that these refunds were due *under the Bridge Contract*, as well as under the Indenture.

Beginning with the June 30, 1945, report, however, Belt noted its claim to interest on refunds of T&NO and Terminal Basic Track Charges, specifically alluding to the provisions of Contingency (b) of the First Bridge Contract as authority. T&NO refused to acknowledge that these refunds were due with interest, and this disagreement persisted until at least 1955. In May and June of that year the parties conferred at length in an effort to compose the differences between them. Though no final agreement was reached, the statement of position by the parties during the conference nevertheless furnishes a significant basis for interpretation of Contingency (b).

The reason for pressing a settlement of disputed issues in 1955 was apparently a desire on the part of Belt to retire the outstanding bonds in order to save interest costs and trustee's fees, and circumvent what Belt thought were exaggerat-edly conservative reserve requirements set up by the bank. The calculations made accordingly assumed that all remaining bonds would be called before the end of 1955. On that basis, T&NO, Terminal and Belt computed, according to their various views of the contracts, the date when fixed payments would cease under the provisions of both Contingency (a) and (b) of the First Bridge Contract. Surprising as it may seem, the joint report clearly shows that T&NO then admitted its obligation to refund to Belt the full amount of the Basic Track Charges delivered to the trustee as a *condition precedent to its going on user basis under Contingency (b)*.[19] Though, inconsistently, it denied Belt's claim to interest on the refund, nevertheless, by agreeing to repayment of these track charges in years subsequent to the fall of the Indenture, T&NO accepted Belt's interpretation of the Bridge Contract as providing for these refunds in Items (2) and (3) of Contingency (b).

It may be, of course, as T&NO now suggests, that this was an unfortunate "slip." Indeed, the internal contradiction in the position adopted and its apparent inconsistency with the provisions of the Amending Agreement,[20] suggest the concession was inadvertent, or, at least, made without sufficient reflection. Be that as it may, the fact remains that T&NO took this stand publicly and approved very detailed calculations based upon it. Moreover, the representation was made at a crucial time when it was bound to influence Belt's decision whether to retire the remaining bonds and abandon its claims under the Indenture

---

18. Insofar as the parties then contemplated the arrival of user date, it was apparently expected to occur under the provisions of Contingency (a), rather than (b), of the First Bridge Contract. This is indicated in the reports by reference to Item (3) of Contingency (a), rather than Item (1) of Contingency (b) (the provisions being identical), as authority for the refund to Belt of its "preliminary expenses." Presumably, the Indenture was not cited because it does not provide interest on the refund of these expenses. See Indenture, Art. V, Sec. 9

(c), p. 70. See also, testimony of Edmond J. Garland, Tr. 82.

19. Belt Exhibit "C," Sheets 5–A and 5–B. See also, testimony of A. J. Kafoed, Tr. 72–73, and Dwight P. Ohrum, Tr. 106.

20. The amending Agreement, as already noted, appears to require this refund only *after* user date. On the other hand, like the Indenture, it does not provide for interest, which was Terminal's basis for joining T&NO's stand in 1955. See testimony of Dwight P. Ohrum, Tr. 129.

in favor of rights secured by the First Bridge Contract.[21] Though it is argued that it was to Belt's advantage to call the outstanding bonds anyway, the evidence in this regard is not convincing. In any event, it is clear that T&NO did not disavow the concession made in 1955 before it was too late, though it had almost two years in which to do so,[22] and that Belt acted in reliance on the representation. Thus, right or wrong, T&NO would seem to be bound by the position it took at the 1955 conference. Having then conceded that Basic Track Charges paid to the trustee were refundable to Belt under Contingency (b) of the First Bridge Contract, and having now conceded that, in that event, interest is due, T&NO must be held to make these refunds with interest at 5% before enjoying user basis.

■ ■ This conclusion can be justified, without regard to the formal contracts, on the theory of "promissory estoppel," Belt having "changed position" in reliance on T&NO's representation.[23] But it is unnecessary to go so far. The fact that in 1955 all parties concurred in the view that Belt must be refunded the Basic Track Charges paid to the trustee before T&NO could go on user basis under Contingency (b) may be accepted as evidencing the true meaning of the provision. This reading of Contingency (b), it must be admitted, is somewhat awkward, but, then, as we have seen, so are all other interpretations. The quandary in which the ambiguous words of the agreements leave us permits no sure solution and invites reliance on the acts of the parties which show their understanding of the contract. Since the result is reasonable, that evidence must be accepted as indicating the real intent of the contracting parties.[24]

In an alternative argument designed partially to overcome the force of a ruling upholding Belt's contentions under Contingency (b), T&NO asks the court for an interpretation of Contingency (a) of the First Bridge Contract, which, if plaintiff's construction is accepted, would then afford a shorter path to user date. The provision invoked permits T&NO to cease fixed payments and go on user basis when:

"  *  *  * the payments by 'Company' to 'Public Belt' of the sums of $410,000.00 per annum, provided for in Section 6 hereof and of $125,000.00 per annum provided in Section 4 of the Track Contract, together with interest allowed pursuant to said mortgage and/or trust deed on any monies from time to time in the hands of said Trustee, except interest allowed on monies set apart for payment of cost of construction of said bridge and approaches or for the maintenance, operation and/or insurance thereof, shall have amounted to $7,000,000.00 plus an amount sufficient

"(1) to pay the premium payable if all of said bonds at the time outstanding were called for redemption on the next ensuing interest payment date, namely 5% of the principal amount thereof,

"(2) to pay all interest on $7,000,000 principal amount of such bonds accrued from the date thereof to the

---

21. While Belt was obligated to call all other bonds as soon as sufficient funds became available, it had absolute discretion as to when to retire the last $100,000 due in 1982, and could have waited until their maturity date, had it chosen to keep the Indenture in effect longer.

22. The report of the joint committee outlining the position of the parties is dated June 4, 1955, and the last bonds were called on April 1, 1957.

23. See Restatement of Contracts, § 90; 1 Corbin, Contracts (1950), § 193 et seq.,

pp. 631 ff. See also, State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519; Reynolds v. St. John's Grand Lodge, A.F. & A.M., 171 La. 395, 131 So. 186.

24. LSA–C.C., Art. 1956; Simmons v. Hanson, 228 La. 440, 82 So.2d 757; Texas Company v. McDonald, 228 La. 353, 82 So.2d 37; Pendleton v. McFarlane, 222 La. 569, 63 So.2d 1; Book v. Schoonmaker, 210 La. 94, 26 So.2d 366. See also, Restatement of Contracts, § 235(e).

next ensuing interest payment date, and

"(3) to refund to 'Public Belt' all sums expended by it prior to the date of this contract upon the cost of the bridge and approaches not refunded to it out of the proceeds of said bonds, plus interest on such sums from the respective dates of repayment thereof at the rate of 5% per annum, said sums however with interest thereon to the Operation Date not to exceed $575,000, * * "

But, as Belt points out, this provision, by its own terms, is no longer applicable because it very clearly contemplates outstanding bonds. Indeed, Item (1) requires a computation of the call premium that would be due "if all of said bonds *at the time outstanding* were called for redemption," and Item (2) refers to "the *next ensuing* interest payment date." All bonds having long since been retired, Contingency (a) cannot now occur. There is accordingly no occasion to consider the various contentions of the parties as to the precise meaning of Items (1) and (2) of the provision.

It may be objected that this summary disposal of the claim under Contingency (a), accomplished by a literal reading of the text without recourse to extrinsic evidence, is at odds with the court's patient, and perhaps laborious, consideration of all possible (and impossible) interpretations of Contingency (b). But the difference, of course, is that in the former case the words were ambiguous in the extreme, while here the language could hardly be plainer. As T&NO itself says (albeit to reach a different result), "the wording of Contingency (a) as to termination of T&NO's fixed advance payments is clear and explicit and no ex-

trinsic evidence is required for its interpretation."[25] The finding that Contingency (a) is no longer applicable of course restricts T&NO's claim to be relieved from fixed payments to the conditions specified in Contingency (b). It follows that T&NO will not achieve user date under the First Bridge Contract until Belt has been refunded the full amount of T&NO and Terminal Basic Track Charges heretofore paid over to the trustee, together with interest thereon at the rate of 5% per annum, as well as Belt's preliminary expenses, as to which there is no dispute.

Judgment accordingly.

### Supplemental Opinion.

This cause came on a former day for hearing on the motion of plaintiff to supplement the opinion filed herein on June 1, 1960. The court, having heard the argument of counsel and considered the briefs submitted, is now ready to rule.

It Is Ordered that the opinion filed herein on June 1, 1960, be, and it is hereby, supplemented by adding thereto the following concluding paragraphs:

"The final question presented relates to the order in which these refunds should be made. It is agreed that under the Indenture Belt was first to be reimbursed the Basic Track Charges paid over to the Trustee by T&NO and Terminal. Accordingly, all funds available in the hands of the Trustee for refund purposes at the fall of the Indenture and turned over by it to Belt should be so applied. However, after the discharge of the mortgage, the provisions of the Indenture no longer control. The indication of the First Bridge Contract, under Contingency

---

**25.** Though T&NO does not make the point (and rightly, since the unambiguous language of the provision offers no pretext for resort to such evidence), it appears that in 1955 the parties understood Contingency (a) as still applicable after the retirement of all bonds and the fall of the Indenture. The joint calculations of June 4, 1955, seem to so indicate. However, unlike the misleading effect of

T&NO's representations at that time, Belt's admission was innocuous since T&NO took no action in reliance on it. The decision to call the bonds, and thereby deprive T&NO of the benefit of Contingency (a), was solely Belt's and T&NO could have done nothing to stop it had it then understood the full impact of the action.

(b), is that preliminary expenses, together with interest thereon, should be refunded before Basic Track Charges. This is shown by the sequence in which the refunds are listed, preliminary expenses being Item (1), while Track Charges are shown as Items (2) and (3). It follows that all monies available for refunds to Belt accruing after the fall of the Indenture should be allocated to repayment of Belt's preliminary expenses with interest until that debt is fully satisfied, and only then used to refund Basic Track Charges.

"The parties having agreed that once the order of payment of the refunds has been determined, the rest is merely a matter of arithmetical calculations, which can more conveniently be made at the end of an accounting period, there is no occasion for the court to burden this opinion further with figures.

"Judgment accordingly."