**TEXAS AND NEW ORLEANS RAILROAD COMPANY, Appellant,**

v.

**CITY OF NEW ORLEANS by and through the PUBLIC BELT RAILROAD COMMISSION FOR the CITY OF NEW ORLEANS et al., Appellees.**

**No. 18643.**

United States Court of Appeals Fifth Circuit.

July 31, 1961.

608

Harry McCall, Jr., Chaffe, McCall, Philips, Burke & Hopkins, New Orleans, La., for Texas & New Orleans R. Co.

A. J. Waechter, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for appellee.

John St. Paul, Jr., Jack M. Gordon, New Orleans, La., Sumter D. Marks, Jr., Ashton Phelps, Phelps, Dunbar, Marks, Claverie & Sims, Dufour, St. Paul, Levy & Marx, New Orleans, La., of counsel, for Texas Pacific-Missouri Pacific R. of New Orleans, intervenor-appellee.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal tests the correctness of the judgment of the District Court declaring certain rights of the parties to a series of contracts concerning the financing and use of the Huey P. Long Bridge over the Mississippi River. What we write must be read against the immediate backdrop of the trial court's exhaustive and able opinion. Texas & New Orleans Railroad Company v. City of New Orleans, E.D.La.1960, 185 F.Supp. 85.[1] Our differences, while decisive, are few in number. Save for such reservations, plainly indicated, we are in general accord with that penetrating analysis of this complex problem.

[1.] An earlier opinion on a procedural point but demonstrating Terminal's peculiar position is reported in D.C., 22 F.R.D. 84. Some of the background is also reflected in our opinions deciding an earlier controversy between Belt and T&NO: City of New Orleans v. Texas & N. O. R. Co., 5 Cir., 1952, 195 F.2d 882; and City of New Orleans v. Texas & Pacific Ry. Co., 5 Cir., 1952, 195 F.2d 887.

All citations hereafter refer to the District Court's decision.

The case is unique in several respects. As it comes to us, indeed as it was tried below, it is bereft of any real controversy over significant legal principles. The question is: what did the parties intend by the agreements? Subsidiary to that is the conditional inquiry: to the extent they are ambiguous what does the intrinsic evidence teach?

It is unique also in that never again will such a series of agreements be created. That is not because legal draftsmen will, or should, heed the implications of the stringent criticisms made by the District Judge concerning these writings. 185 F.Supp. 85, 86. Complex they are. Prolix, not succinct, must be the descriptive. But we glean no suggestion of "a persistent and deliberate effort to avoid clarity in favor of intricate complexity." They were drawn during the nation's worst depression. The operating contracts for the use of the Bridge and belt system tracks looked far into the future. The initial period was 50 years with options for selective extensions running all the way from 50 more years to 999 years and under some possibilities an additional 999 years. The task facing scriveners as they undertook to pierce the veil to write almost as did authors of now historic political documents, warranted some liberties. The problem was the familiar one: how, on the one hand, to state matters with sufficient generality to cover the myriad of problems which, inevitably bound to occur, were yet beyond precise forecast, and yet, on the other hand, compose with sufficient specificity the answers to highly specialized contingencies. Indeed, the controversy of this case is in that category. Moreover, there were added complications. Financing terms were naturally imposed by the underwriter, Reconstruction Finance Corporation, a governmental entity. By the nature of things, the underlying operating contracts producing the sole revenues to fund the debt were tailored to the principal demands of the Indenture, a 124-page printed document supplemented twice by another 81 pages. One uncertainty was *who* would use the Bridge. It was certain only that T&NO would. It was hoped that someday Terminal would. But when, if ever, was a thing unknown. How to prescribe for the unpredictable entry of a new user a formula to equalize the funding obligation and establish an equitable basis of compensation for operations thereafter was of real concern. Then, too, was the necessity of adapting many of these things to the jargon of the railroad business lest what was written, understandable to lawyers and perhaps judges, would fail to meet the workaday needs of those in the industry. After our experience in reviewing the First and Second Bridge Contracts, the First and Second Track Contracts, and the 1940 Amending Contract, all of which comprise 194 printed pages in addition to the Indenture's 235, we can understand the likely sense of despair that may have led the Judge to describe this as a "huge dark labyrinth, from which, * * * it is almost impossible to find the exit before tiring and *losing the thread, assuming there is one.*" 185 F.Supp. 85 at 86.

But it is the latter which highlights the precise point of our difference. For what we see, if nothing else, is a *thread* —a thread running throughout all of this mass. It is that thread which gives it continuity, cohesiveness and a central meaning. It is that thread which manifests the basic understanding of the parties. That thread is neither destroyed nor lost by occasional digressive patterns which here and there obscure it.

That thread emerges in a very simple way. To fund the debt the lenders required, and the Indenture provided, a mortgage on the Bridge and its approaches.[2] This included, of course, tracks on the Bridge and the approaches. As the naked properties apart from productive use afforded little security value, it was also required that Belt assign the Bridge Contracts and that the operating revenues of the Bridge be pledged to the Trustee. 185 F.Supp. at page 87. But

---

**2.** These were always well defined in point of beginning. When used, the term "Bridge" includes the approaches.

to make the Bridge usable, it was necessary that a substantial network of tracks be built and constructed between the main line of T&NO and the Bridge approaches. Likewise it was necessary for user railroads to have use of Belt's extensive network of tracks within the terminal area of New Orleans. The First Track Contract and the Second Track Contract relate to the use of these tracks.[3] All of the new construction required to supply these terminal facilities and the subsequent maintenance of it was to be the immediate financial responsibility of Belt. None of the proceeds from the Bridge bonds was, or was to be, available to defray Belt's cost of construction or maintenance of these tracks. However, the Indenture required that these Track Contracts be assigned and that the revenues received by Belt for the use of these tracks be pledged to the Trustee as additional income from which to fund the debt and maintain the mortgaged properties. 185 F.Supp. at page 87.

At the same time, the Indenture recognized that this was additional security requiring special treatment. Provisions were then made in the Indenture by which after the accumulation of specified amounts for prescribed uses the Trustee was to refund these Track Rentals to Belt. 185 F.Supp. at page 88. But the Trustee first had to have funds with which to do this. The Indenture imposed no obligation on the payor, i. e., the supplier of those funds. This was done pursuant to the First Track Contract incorporating § 7 (as well as others) of the First Bridge Contract concerning the

duration and amount of such payments. The obligation of T&NO to make the payments from which refunds would come was imposed on it by the First Bridge Contract and the First Track Contract. While the Indenture did not itself impose an obligation it was evident that user railroads would supply the money with which to make these refunds.[4]

T&NO does not dispute this. Indeed, it frankly concedes that so long as any of the bonds were outstanding and unredeemed the § 6 Bridge Rentals[5] continued until Belt was refunded all of the Track Rentals received by the Trustee. Hence it had a burden in fact of making the refunds to Belt.

Thus we see this single thread which runs through each and all of the contemporaneous documents: Belt shall make available non-Bridge revenues as additional security; Belt shall ultimately get a refund of all such Track Rentals; the refunds must of necessity come from Bridge Rentals and operations; T&NO shall continue to pay Bridge Rentals until the Trustee has made the refund of Track Rentals in full.

In a nutshell, T&NO's whole thesis rests on the contention that while it was compelled to make payments to supply the source for Track Rental refunds to Belt so long as the Indenture continued, this terminated when the Indenture fell in 1957 at the time the last bonds (due in 1982) were redeemed.

While it is possible for resourceful counsel to construct a fairly plausible argument that some of the language of

3. The term "tracks" always refers to these. And Track Rental refers to payments by user railroads to Belt for the use of these tracks. They are not to be confused with tracks on the Bridge, see note 2, supra.

4. Related to this but stated in this note in order not to complicate the simplicity of the statement in the text was his problem. Under § 4 of the First Track Contract T&NO was required, as adjusted, to pay Track Rental of $112,500 per year. Under § 3 the applicable formula fixed T&NO's pro rata share of Agreed Track Charges (essentially on the basis of re-

covery of Belt's investment in each of the zones of the Track System on a 20-year basis and all maintenance and operation expenses prorated on the basis of actual numbers of cars of various carriers using the tracks). The difference between this lesser § 3 figure and the amount payable under § 4 was denominated an "Advance" by T&NO. Under the Indenture and the other contracts this "Advance" was to be refunded to T&NO by the Trustee with 5% interest prior in time to refund to Belt of the Track Rentals.

5. Subject perhaps to § 7(a) contingency, see 185 F.Supp. 85 at page 93.

the First Bridge Contract and the First Track Contract (and perhaps others) permits this conclusion, we think this so inherently unreasonable in a fabric through which runs this identifiable, clear thread that we are unable to find this to have been the intention of these knowledgeable business parties.

A number of reasons might be advanced but one more than suffices. The consequence of T&NO's thesis would be to invest the Trustee with a power markedly and adversely to affect the rights and pocketbook of one not a direct party to the Indenture and under circumstances bearing no relation to the real needs of the Trust estate. Where the thrust of the entire bulk of these complex documents was in the direction of a single, unified interest on the part of all participants toward building, using and paying for a needed Bridge, this would have been a disruptive encouragement to connivance and sharp dealing between Belt and the Trustee to the detriment of a helpless party who alone could suffer depending on the whim of their decision.[6] We do not believe businessmen would knowingly invite or tolerate the likelihood or even possibility of such precarious action.[7]

Nor are there any real or insuperable obstacles to that common sense reading of these agreements. That this whole mass of legal writing is not altogether symmetrical, that here and there some problems are created because of semantical contradictions or occasional conflicts

should be no surprise. 185 F.Supp. at pages 89–91. Neither does this create a stalemate—and that is what might transpire since the so-called parol extrinsic evidence is certainly susceptible of inferences which cancel out one, rather than the other, construction.[8] See 185 F.Supp. at pages 91–93.

The Trial Judge saw one such obstacle in Article II of the Amending Contract of 1940 which he declared to be irreconcilable to the First Bridge and First Track Contract. 185 F.Supp. at pages 90–91. The Amending Contract was T&NO's formal consent for Belt to execute the Second Bridge and Second Track Contracts with Terminal on terms more favorable than those binding T&NO. 185 F.Supp. at page 88. Article II expressly declared the effective date of the revised Bridge Rental under the formula therein specified to be a time after "User Date." Since User Date could not have arrived under § 7(b) [9] until all refunds—whatever they might legally be—were made to Belt under § 7(b) (2) the provision in (ii) of Art. II for refunds of "Belt Advances" under term (C) [10] was of no interpretative significance. It was a contradiction and hence it could not operate as corroborative evidence of a purpose of the parties in § 7(b) (2) to impose on the user railroads a duty to refund Track Rentals to Belt after the fall of the Indenture.

But the Court's difficulty was its assumption that Article II would be opera-

---

6. Art. V, § 13, of the Indenture provided that if the last bonds outstanding were those maturing October 1, 1982, and the Interest and Sinking Fund was sufficient for redemption as well as the payment of all costs and charges of the Trustee, "the trustee may, and upon the written request of the Commission [Belt] shall, call all said bonds * * *."

7. By 1955 all but the last bonds in the amount of $100,000, due 1982, had been redeemed.

8. For example, to offset the persuasive fact that in the agreed calculations of the 1955 joint study, refund of Track Rentals to Belt, with and without interest, was extended to specified periods of

time way beyond the fall of the Indenture, T&NO countered with material from 1936–1945 showing that on semi-annual status and other reports the Indenture, not the First Bridge Contract, was cited for such refunds. Additionally they bore no interest as would be the case if they were under § 7(b) (2) which prescribed 5% interest, 185 F.Supp. at pages 91–93.

9. Contingency § 7(b) is set out at 185 F. Supp. at page 89.

10. The term "Belt Advances" was defined as "the aggregate of (C) the following items." Then followed items (g) through (k). Subitems (i) and (j) were the Track Rentals from T&NO and Terminal respectively pledged under the Indenture.

tive only after satisfaction of contingency § 7(b). This rested on the Court's conclusion that contingency § 7(a) evaporated with the fall of the Indenture when no further bonds were outstanding. 185 F.Supp. at page 94. For reasons we later discuss this was, we conclude, a basic error. The result is that Article II of the Amending Contract of 1940, by imposing on both T&NO and Terminal the obligation ultimately to repay "Belt Advances" —which encompassed Track Rentals—is intrinsic corroboration of the intention of the earlier First Bridge and First Track Contract.[11] Indeed it carries it out with the adjustments made desirable under the new circumstance of the entry of a new user (Terminal) on the Bridge.

■■■■ Consequently we agree with the conclusion reached by the District Court that despite the fall of the Indenture § 7(b) (2) required T&NO to continue Bridge Rentals until its Track Rentals previously received by the Trustee are refunded to Belt with interest.[12] Our point of principal difference is that we find no need to resort to extrinsic evidence which, as the Judge so ably points out, requires a considerable amount of explaining of its own before it is too reliable as an explanation of the probable intent of the parties under the Contracts determined by him to be ambiguous. 185 F.Supp. 91–93. It does not weaken what we have just said or our basic conclusion on the intrinsic interpretation of the Contracts themselves for us to state further that as a fact finding by the Trial Court its treatment of the extrinsic parol evidence successfully withstands the scrutiny of the clearly erroneous concept under F.R.Civ.P. 52(a), 28 U.S.C.A.

■■■ While T&NO does not sustain the appeal as to § 7(b), we think it is correct that § 7(a) survives the fall of the Indenture. The Court held that contingency 7(a) contemplated the existence of outstanding bonds. 185 F.Supp. at

page 94. We think this conclusion is counter to another positive and clear thread. Forecasting the great unknown and the uncertain future, T&NO as the then only user of the Bridge was accorded alternative protection. One, § 7(a), was to be measured in a sum certain beyond which no amount of money ever would be required. The other, § 7(b), was uncertain in time and amount. Section 7(a) was to afford an absolute ceiling. There is nothing to indicate that T&NO was to risk the loss of the protection of the one while asserting a more favorable protection under the other. Indeed, the First Bridge Contract speaks in terms of "whichever of said contingencies (a) and (b) shall have earlier occurred." This reflects a purpose to determine its availability and application on the basis of actual occurrence. It is literalism to the extreme to conclude, as did the District Judge, that reference in subparagraph (1) "to pay the premium payable if all of said bonds at the time outstanding were called for redemption * * *" necessarily contemplated the existence of outstanding bonds. This and the subparagraph (2) reference to interest "next ensuing" are but minor elements to make certain that as part of the contractual ceiling T&NO—the then only known prospective used—would have to pay the principal and the interest on all of the bonds together with whatever premiums might be payable for earlier redemption. It meant that and it meant nothing more. It is important to note that the reference "whichever of said contingencies * * * shall have earlier occurred" does not speak in terms of *time* of payments of subitems (1), (2) or (3). Contingency § 7(a) is wholly in terms of the *payment* of a total sum (stated to be $7,000,000) "plus an amount sufficient" to pay items (1), (2), (3). What brings contingency § 7(a) into play is the payment of such total sums, not the date of it. Indeed,

---

11. Additional intrinsic evidence is available. For example, in § 7 (b) (2) Track "Advances" are excluded, thus indicating that the remaining portion of the § 4 Track Rental was included.

12. Since § 7(b) expressly calls for interest at 5% it is now stipulated that the refund, if otherwise legally due, shall include this interest.

its purpose was to determine another date, that is, User Date.

This conclusion requires, of course, the answer to some further problems. The District Judge did not reach these but since they call for the construction of unambiguous provisions of the contract and the parties need authoritative declarations without the loss of further time, we must undertake to determine them. We take them in the order they appear in § 7(a). Under subparagraph (1) we think that the premium referred to is not confined to the premium on the last bonds redeemed. The evident purpose is to make Belt whole for all interest and all premiums paid throughout the life of the bonds. Hence this will include premiums paid over the life of the Indenture. There is good reason for this. At one point, by the payment of the premium of approximately $275,000 the interest rate was reduced from 5% to 4%. Obviously T&NO was the direct beneficiary of this under subparagraph (2).[13] Next is the question of the total interest. Read literally subparagraph (2) calls for "all interest on $7,000,000 principal amount of such bonds accrued from the date thereof." But only $6,000,000 in bonds were ever issued. Interest did not, and could not, accrue on 7 million. This element refers then to the total interest actually paid.

There is also the question of the principal amount. Under the introductory paragraph this requires that the sums paid by T&NO "shall have amounted to $7,000,000.00 plus * * *" items (1), (2), (3). Considering that the money to produce this stated figure of $7,000,000 was to come from the payments "of $410,000.00 per annum, provided for in Section 6 [of the Bridge Contract] and of $125,000.00 per annum, provided for in Section 4 of the Track Contract * *" any provisions in the Bridge Contract calling for a reduction in such payments, in the absence of any clear language to the contrary, would automatically be ap-

plicable to the total to be generated by them. Under § 7 these sums were reduced to $372,500 and $112,500, respectively, based on the fact that only $6,000,000 in bonds were finally issued. The obvious meaning of the Contract is to reduce the principal sum from $7,000,000 to $6,000,000 for the purpose of calculating User Date. The precision with which all of these figures were used negatives the idea that this reference to the maximum and contemplated total of bonds to be issued was merely an approximation that might operate as a premium or a penalty. Finally, in calculating the amount paid to satisfy the principal amount of $7,000,000 (reduced by us to $6,000,000) plus items (1), (2) and (3), this means net payments actually made. A part of T&NO's Track Rental included, of course, the so-called "Advance," see note 4, supra. But this was to be, and in fact was, refunded to T&NO with interest at 5%. So much as has been refunded with interest is not to count toward the sums required to have been paid under § 7(a).

Two further things should be briefly mentioned. Some of the pleadings as between Terminal and Belt indicate some incidental controversies dependent upon the Court's ultimate determination on the basic questions presented by T&NO's complaint. Nothing done here is intended to intimate a decision upon any such matters. Further we find no error in the Court's supplemental opinion concerning the order of precedence in which the refunds are to be made. 185 F.Supp. 94.

This brings us to the last point. While the contention is not too clear, T&NO now alternatively argues, especially as to refunds under § 7(b)(3) of Track Rentals paid by Terminal, that the amounts must be limited to such of the funds derived from Terminal's Track Rentals as were actually employed by the Trustee in payment of principal or interest, or both. At most, it states as a further al-

---

**13.** This resulted in a total gross savings of $572,866.45 or a net saving of $298,766.45.

**614**

ternative, the funds could have been used for maintenance and upkeep of the mortgaged property. A point seems to be made that no payment may be required of T&NO under the Bridge Contracts to provide money with which to refund to Belt any portion of Terminal's Track Rentals used by the Trustee to make refunds. The District Court dealt only partially with this. 185 F.Supp. at page 90. So far as we are able to discern it, there is not too much difference between the parties as to the abstract statement of the legal point. But Belt points out that what T&NO really contends is something quite different. T&NO, so Belt urges, claims that since it is impossible, actually or theoretically, to now trace, dollar by dollar, the precise source of every disbursement by the Trustee, Belt must fail because it does not satisfy the requirement in both § 7(b) (2) and (3) that the Track Rentals were used by the Trustee "to discharge the obligations of [Belt] under said bonds and said mortgage and/or trust deed."

While this bears most directly upon an accounting which is not presently involved, any such result would be both artificial and a too narrow reading of the quoted phrase. The monies—Track Rentals—were certainly "paid to," § 7(b) (2), or "retained by," § 7(b) (3), the Trustee pursuant to the terms of the "mortgage or trust deed." It is not suggested that with respect to this whole controversy between Belt and T&NO the Trustee either received or expended funds in an unauthorized manner. What went in was required. What went out was authorized. The elaborate formula in Art. II of the Amending Contract is a formal recognition of an inescapable fact that, in the absence of a binding specification, every dollar of expenditure represents at least in part every dollar of income.

The central thread discussed earlier reflects the purpose of § 7(b) (2) and (3). The reimbursement assured by it to Belt is not to be thwarted by theoretical manipulation of various accounts.

 Since this is an action for declaratory relief and no money judgment or accounting was sought, it is appropriate that the judgment as modified herein be affirmed, but that the matter be remanded for such other, further and consistent proceedings as may be proper.

Modified and as modified affirmed and remanded.