G. E. LAWRENCE as Trustee in Bankruptcy of Commercial Engineering & Manufacturing Company, Inc., Bankrupt, and First National Bank in Grand Prairie, Texas, Appellants,

v.

UNITED STATES of America, Appellee.

No. 22573.

United States Court of Appeals
Fifth Circuit.

May 9, 1967.

Jay W. Ungerman, Ungerman, Hill, Ungerman & Angrist, Dallas, Tex., Mehl & Williams, Fort Worth, Tex., for appellant, G. E. Lawrence.

Walter A. Cober, Grand Prairie, Tex., Donna Meagher Easterling, Cober & Easterling, Grand Prairie, Tex., for appellants.

Mitchell Rogovin, Asst. Atty. Gen., John B. Jones, Jr., Act. Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Attys.,

Dept. of Justice, Washington, D. C., Kenneth J. Mighell, Asst. U. S. Atty., Melvin M. Diggs, U. S. Atty., for appellee.

Before BROWN, COLEMAN and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

■ Possession may be nine points in the law. And at times with a bank's favored right of setoff, it may turn out to be nine and one-half or even ten. But it did not work below, nor does it here, in this contest over a special bank account established by the Government to finance the contractor in the performance of a contract for the Air Force. As did the trial Court, we view the question of contract interpretation as one of law, not fact for jury resolution, and affirm the Government's recovery based on a directed verdict. We also affirm the trial Court's actions in dismissing the Bank's counterclaims and the Trustee's efforts to commandeer for administration in the contractor's bankruptcy proceeding either the bank balance or the sums earlier received by the Internal Revenue Service under a levy.

## I.

It is terribly easy to let this thing get complicated. But at heart, it is very, very simple.

The Contractor[1] under two separate undertakings agreed under the First Contract[2] to supply 262 bomb trailers and adapter bolsters and under the Second Contract,[3] 197 bomb trailers and adapter bolsters. Of importance here, the First Contract was amended June 4, 1961, to provide for delivery of scheduled spare parts. The average contract price approximated 6½ million dollars. Financing had been privately arranged with the Bank[4] and associate banks and for security, the First Contract was assigned to the Bank as permitted. 41 U.S.C.A. § 15; 31 U.S.C.A. § 203. Some time in May 1961 it became apparent that Contractor could not complete these contracts without additional financing, and it seems agreed that none was available from private sources. At this point the Government gets into the act in a new role, that of financier.

As permitted by statute[5] and regulation,[6] the Government entered into an arrangement for advance payments[7]

---

1. Commercial Engineering and Manufacturing Company, Inc.

2. Contract AF 41(608)10677 dated May 12, 1959.

3. Contract AF 41(608)12953 dated December 28, 1960.

4. First National Bank in Grand Prairie, Texas.

5. 10 USCA § 2307:
   "Advance payments
   "(a) The head of any agency may—
       "(1) make advance, partial, progress, or other payments under contracts for property or services made by the agency; * * *
   "(b) Payments made under subsection (a) may not exceed the unpaid contract price.
   "(c) Advance payments made under subsection (a) may be made only if the contractor gives adequate security and after a determination by the head of the agency that to do so would be in the public interest. Such security may be in the form of a lien in favor of the United States on the property contracted for, on the bal-

ance in an account in which such payments are deposited, and on such of the property acquired for performance of the contract as the parties may agree. This lien is paramount to any other liens."

6. See Armed Service Procurement Regulation 4-400 et seq. (appendix e) implemented by Air Force Procurement Instruction 58-700 et seq.
   "58-700 Payment of Advance Payment Monies to Contractor—Advance payments to a Contractor may be approved by a contracting officer in the Financial Branch, authorized to approve such payment. Payments approved will be immediately deposited by the contractor in the Special Bank Account. Approved advance payments will be only in amounts sufficient to satisfy the requirements of the contractor during a limited period. Special bank account means a restricted bank account opened in the name of the contractor and earmarked 'Special' ".

7. Advance payments, as such, are to be distinguished from "progress payments" prescribed under the First and Second Contracts. Advance payments are made

for the Second Contract for a maximum sum of $700,000. This was handled by two separate agreements. One was the Advance Payment Agreement (Adpay) which was executed on July 27, 1961, by the Government and Contractor. The other, executed the same day, was the Agreement for Special Bank Account (Spebank). It bears emphasis that these advance payments could be used with respect to the Second Contract only.[8] But this distinction was soon obliterated for on October 9, 1961, the arrangement was made for an aggregate of $950,000 advance payments for both the First Contract and the Second Contract. Again this took the form of two separate agreements. One was an agreement described as "Advance Payment Pool Agreement" executed by the Government and Contractor. The other was an agreement for Special Bank Account executed by Government, Contractor, and Bank. Thereafter funds were advanced under the pool agreements.[9] This meant that the advanced payments deposited in the Special Bank Account were available for financing both Contracts, including, of significance here, that portion of the First Contract covering the delivery of spare parts.

Except that the "Pool Agreement" specifically referred to both the First Contract and Second Contract in all appropriate places, the two sets of agreements of July 27, 1961, and October 9, 1961, were substantially identical.[10] The Adpay, a detailed document of nearly eight pages single-spaced, contained elaborate provisions for the protection of the Government. It expressly required the maintenance of a "Special Bank Account" [11] into which all advance payments

---

available in advance of the acquisition of material, equipment needed or labor expended. This affords funds for the payment of such items. Progress payments, on the other hand, are an agreed percentage of the value of uncompleted work in progress. See, e. g., par. 43, First Contract (R. p. 95):

"Progess payments shall be made to the Contractor as work progresses, from time to time upon request, in amounts approved by the Contracting Officer upon the following terms and conditions:

"(a) Computation of Amounts

"(1) Unless a smaller amount is requested, each progress payment shall be (i) seventy-five per cent of the amount of the Contractor's total cost incurred under this contract plus (ii) * * * the amount of the progress payments made by the Contractor to its sub-contractors * * *; all less the sum of previous progress payments.

   *     *     *     *     *

"(b) Liquidation

"Except as provided [not applicable] * * * all progress payments shall be liquidated by deducting from any payment under this contract, other than advance or progress, the amount of unliquidated progress payments, or seventy-five per cent of the gross amount invoiced, whichever is less. * * *."

8. By September 19, 1961, the maximum $700,000 advances for the Second Contract had been deposited in the Special Bank Account.

9. Deposit of an additional $125,000 on October 11, 1961, plus the earlier ones (see note 8, supra) brought the total advances to $825,000.

10. Thus whereas the Advance Payment Agreement refers throughout to "the contract" (meaning the First Contract, note 2, supra), the Advance Payment Pool Agreement refers to "the contracts" since it encompasses both the First and Second Contracts. While the nature of the issues here involved makes it necessary for us to set out at length the pertinent provisions of Advance Payment Agreements, no further mention of this difference in wording will be made.

11. "2. Special Bank Account. Until all advance payments made hereunder, and interest charges, are liquidated and the Administering Office approves in writing the release of any funds due and payable to the Contractor, all advance payments and all other payments made under the contracts shall be made by check payable to the Contractor and be marked for deposit only in a Special Bank Account with the Bank designated in paragraph 14 (b) below. No part of the funds in the Special Bank Account shall be mingled with other funds of the Contractor prior to withdrawal thereof from the Special Bank Account as hereinafter provided. Except as hereinafter provided, each withdrawal shall be made only by check of the Contractor countersigned on behalf of Government by the Contracting Officer,

as well as all other payments under the Contracts should be deposited which, in turn, required Government countersignature for withdrawals. Funds in the Special Bank Account were subject to withdrawal solely for the purpose of making payments for direct materials, direct labor, and administrative and overhead expenses under the Contract.[12] It called for the execution on an approved form of a bank agreement setting forth the special character of the account and the responsibilities of the Bank thereunder.[13] And of special importance here, Adpay secured to the Government a par-

amount prior lien upon any balance in the Special Bank Account[14] which was reinforced by a prohibition against assignments,[15] amplified by a representation and warranty against the existence of any assignments[16] as well as a covenant against any other assignments which might have the effect of impairing the Government's security interest.[17] Finally, the Government was given the widest powers to declare default.[18]

The Spebank agreements for Special Bank Account were likewise substantially identical. Each was executed on,

---

or such other person or persons as he may designate in writing (hereinafter called the 'Countersigning Agent')."

Section 14(b) provides: "Designations and Determinations. * * * ` b. Depository. The bank designated for the deposit of payments made hereunder shall be First National Bank in Grand Prairie."

12. "3. Use of Funds. The funds in the Special Bank Account may be withdrawn by the Contractor solely for the purposes of making payments for direct materials, direct labor, and administrative and overhead expenses required for the purposes of these contracts (including without limitation, payments incident to termination for the convenience of the Government) and properly allocable thereto in accordance with generally accepted accounting principles * * * or for the purpose of reimbursing the Contractor for such payments, and for such other purposes as the Administering Office may approve in writing. Any interpretation required as to the proper use of funds shall be made in writing by the Administering Office."

13. "7. Bank Agreement. Before an advance payment is made hereunder, the Contractor shall transmit to the Administering Office, in the form prescribed by such office, an Agreement in triplicate from the bank in which the Special Bank Account is established, clearly setting forth the special character of the account and the responsibilities of the bank thereunder. * * *."

14. "8. Lien on Special Bank Account. The Government shall have a lien upon any balance in the Special Bank Account paramount to all other liens, which lien shall secure the repayment of any advance payments made hereunder together with interest charges thereon."

15. "12. Prohibition Against Assignment. Notwithstanding any other provision of the contracts, the Contractor shall not transfer, pledge, or otherwise assign this contract, or any interest therein, or any claim arising thereunder, to any party or parties, bank, trust company, or other financing institution * * *."

Adpay (Pool) expressly excepted from this prohibition the "Assignment in trust dated 19 July 1961 wherein the proceeds of P.L. 85–804 claim under [the First Contract] are assigned to creditors." The record shows that on February 8, 1962, the Air Force Contract Adjustment Board denied this claim seeking additional payment of $974,582.69 because of losses from Government changes.

16. "16. Representations and Warranties. To induce the making of the advance payments, the Contractor represents and warrants that:
"* * *
"f. * * * there has been no assignment of claims under any contract affected by these advance payment provisions, or if there has been any assignment, such assignments have been terminated."

17. "18. Covenants. During the period of time that advance payments may be made hereunder and so long as any such advance payments remain unliquidated, the Contractor shall not * * *
"b. sell, assign, transfer, or otherwise dispose of accounts receivables, notes, or claims for money due or to become due; * * *."

18. "11. Default Provisions. Upon the happening of any of the following events of default,
"(i) termination of the contracts by reason of fault of the Contractor
"(ii) a finding by the Administering Office that the Contractor * * * (b)

or as of, the day of Adpay. Both by formal recitals [19] and by express covenants,[20] specific reference was made to Adpay between Contractor and Government. And again, the Government was granted a paramount prior lien upon the credit balance in the Special Bank Account.[21]

On September 15, 1961, the Bank by letter waived any rights it had to any of the proceeds under the First Contract.[22]

has so failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of the contracts * * * the Government, without limiting any rights which it may otherwise have, may, in its discretion and upon written notice to the Contractor, withhold further withdrawals from the Special Bank Account and withhold further payments on the contracts. Upon the continuance of any such events of default for a period of thirty (30) days after such written notice to the Contractor, the Government may, in its discretion, and without limiting any other rights which the Government may have, take the following additional actions as it may deem appropriate in the circumstances; (a) withdraw all or any part of the balance in the Special Bank Account by checks payable to the Treasury of the United States signed solely by the Countersigning Agent and apply such amounts in reduction of advance payments then outstanding hereunder and in reduction of any other claims of the Government against the Contractor; * * * (c) demand immediate repayment of the unliquidated balance of advance payments hereunder * * *."

19. "RECITALS.
"(a) Under date of 9 October 1961 the Government and the Contractor entered into an Advance Payment Pool Agreement providing for the making of advance payments to the Contractor on * * * [the First Contract and the Second Contract]. Copy of such advance payment provisions has been furnished to the Bank.
"(b) Said Contract or Agreement requires that amounts advanced to the Contractor thereunder be deposited in a Special Bank Account or accounts at a member bank * * * of the Federal Reserve System * * * separate from the Contractor's general or other funds; and, the Bank being such a bank, the parties are agreeable to so depositing said amounts with the Bank.
"(c) This Special Bank Account shall be designed 'Commercial Engineering and Manufacturing Company, Department of the Air Force Special Bank Account.' "

20. "Covenants.
"In consideration of the foregoing * * it is agreed that:
" * * * *

"(2) The Bank will be bound by the provisions of said contract or contracts relating to the deposit and withdrawal of funds in the above Special Bank Account, but shall not be responsible for the application of funds withdrawn from said account. After receipt by the Bank of written directions from the Contracting Officer, or from the Administering Office designated in the advance payment contract mentioned above, or from the duly authorized representative of the Contracting Officer or the Administering Office, the Bank shall act thereon and shall be under no liability to any party hereto for any action taken in accordance with the said written directions. Any written directions received by the Bank through the Contracting Officer upon Department of the Air Force stationery * * * shall, in so far as the rights, duties and liabilities of the Bank are concerned, be conclusively deemed to have been properly issued * * * by the * * * Air Force."

21. "Covenants
" * * * *
"(1) The Government shall have a lien upon the credit balance in said account to secure the repayment of all advance payments made to the Contractor, which lien shall be superior to any lien or claim of the Bank with respect to such account."

22. "Our customer * * * has requested that in order to expedite the completion of the spare parts program under [the First Contract] that this bank waive any rights that it may have under the assignment of the above contract to funds yet to be dispersed. It is our understanding that this request is necessitated to permit the United States Air Force to finance the spare parts program to completion. The First National Bank in Grand Prairie specifically agrees to waive any rights which it may have under the assignment of Air Force contract 10677 with regard to any future monies to become due under this spare parts program.
"It is specifically understood, however, that the [Bank] waives no right which it may have under the 'assignment * * * under Public Law 85–804.' " (se note 15, supra).

With this contractual background, the subsequent facts may be severely capsulated. From July 27, 1961, to February 6, 1962, in addition to the $825,000 advance payments (see notes 8 and 9, supra), the Government deposited approximately an additional one million dollars. This represented payments (less deductions for progress payments, see note 7, supra, and others) made to the Contractor for items delivered under the First and Second Contracts. By February 12, 1962, withdrawals on countersigned checks (see Par. 2 Adpay, note 11, supra) representing payments for materials, labor, and administrative expense (see Par. 3 Adpay, note 12, supra) had reduced the balance of the Special Bank Account to $129,183.23. On that day the Government under Par. 11 (2)(b) of the Default Provisions (see note 18, supra) notified the Contractor that further withdrawals from the Special Bank Account would be withheld. About the same time, the Contractor informed the Government that it had ceased all work on both contracts. Subsequently, the Government gave written termination notice as to both Contracts (see, e.g., Par. 11 (ii), note 18, supra). This set in motion the Government's right to demand payment of the balance. It did this on March 22, 1962, by presenting a check for that amount signed by the Government only. The Bank declined to honor the check because with intervening Internal Revenue levies of $21,384 and the exercise of setoff by the Bank for indebtedness due it ($69,318.82) only $38,480.41 remained. This it paid to the Government on the presentation of a check for that amount signed solely by the Government.

The Government thereafter filed suit against the Bank for $69,318.82.[23] Subsequently, the Bank filed a counterclaim seeking recovery of $160,618 on one count and in the other the amounts claimed by the Government presumably as a setoff. In the meantime the Contractor filed a petition in bankruptcy on February 28, 1962. Consequently, the Bank also filed a third party complaint against the Trustee to resolve the adverse claims made by the Trustee against both Bank and Government. The Trustee sought recovery from the Bank (or the Government) of the amount of the February 12, 1962, balance less the Internal Revenue levies. By a separate claim against the Government the Trustee sued for the amount collected by the tax levies. Upon completion of all of the evidence, the District Court granted a directed verdict as to the Government's affirmative claim and dismissed the counterclaims as well as the claim of the Trustee against the Government for the balance of the Special Bank Account and the tax levies.[24] The Bank and the Trustee each appeal. We reject both.

## II.

### The Bank's Appeal

*A. The Special Bank Account Balance.*

In trying to maintain its hold on the $69,318.82 balance of the Special Bank Account, the Bank asserts this principal thesis. This sum represents the

23. The parties stipulated that the $21,384 paid to the Internal Revenue was for intramural adjustment between Executive departments and not in controversy between the Bank and the Government.

24. The record indicates that by stipulation the parties and the Court severed from this judgment any and all claims which the Trustee has or might have against the Government or others on behalf of the bankrupt estate for breach of contract, damages, etc. This includes the claim for accounting for the value of inventory and unfinished goods taken over by the Government. We emphasize here that nothing said or unsaid, express or implied, is to be taken as even the slightest, faint whisper of a possible suggestion that by derivative or any other theory we are expressing any intimation on the nature of character or kind of claims reserved, their merits or lack of them, or the judgment finally to be rendered. This is for another day or days by another Court or Courts in other proceeding or proceedings on their own record unaffected in any way by this opinion and decision.

outstanding balance of the so-called COD items[25] paid initially by the Bank and thereafter not reimbursed by the Contractor to enable the Contractor to take delivery of materials, occasionally meet payrolls, and the like. This "interim" financing was required because of Adpay mechanics of countersigning checks (see notes 11 and 12, supra) took too much time. Defensively to the Government's suit, it then urged two things. First, as a matter of contract interpretation, nothing in Spebank—the only contract to which it was a signatory—denied it a lien or gave the Government priority. Implicit in this is the further contention that nothing in Adpay is of any help since, contrary to the Government's contention, the Bank was neither a signatory to, nor bound by, that separate agreement between other parties. Second, there was an oral agreement or conduct amounting to estoppel which permitted the Bank to advance COD items for reimbursement out of the Special Bank Account. In its counterclaim, the Bank sought affirmative recovery of this balance on similar theories.

In the face of the plainest of words in Spebank granting the Government a superior lien over the Bank (see note 21, supra), our only difficulty is in fathoming just what the Bank's theory is. Cf. Carter v. American Tel. & Tel. Co., 5 Cir., 1966, 365 F.2d 486, 492, cert. denied, 1967, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546. The Bank does not deny the words—nor presumably does it deny their literal effect—with respect to any part of the advance payment still remaining in the account on D-Day. Apparently what it argues is that apart from Adpay, the "credit balance" means the balance, if any, of the advance payments still in the account. Consequently, the argument runs, it being undisputed that all of the $825,000 plus nearly a million more was withdrawn to reduce the balance to $129,183.23, there was no such "credit balance."

■ Whatever might be the difficulties, which we next discuss, of incorporating in Spebank the elaborate withdrawal provisions of Adpay, the meaning of this lien clause and the meaning of the terms within it are clear. The term "credit balance" means exactly what it says—the balance in the account at any stated time without regard to the origin of the particular funds making up that balance. Likewise, the term "said account" can refer to nothing other than the Special Bank Account identified as such in sub-par. (c) of the Recitals (note 19, supra). So, too, is the meaning of the term "Advance payments." Adding them all together, the lien clause assures to the Government up to the dollar limit of the credit balance remaining in the Special Bank Account a lien superior to any lien or claim of the Bank with respect to that portion of the advance payments not yet reimbursed. Since it is undisputed that none of the $825,000 had ever been paid back, the Government, vis-à-vis the Bank, had a superior lien to the amount of the balance, $129,183.23.[26]

■ But we need not confine affirmance to this reading of this single lien covenant of Spebank. It is equally plain from the language used in Spebank that the Bank obligated itself to comply with all provisions of Adpay "relating

---

**25.** We follow the pattern of the record in which the parties used "COD" items as a handy label to cover all types of situations in which the Contractor was required to make payment before receiving the goods or the services. These included incoming freight bills, payment of invoices for materials with drafts attached, and occasional payrolls. Payment of these items by the Bank was in one of two forms. Normally it would merely honor as an overdraft the Contractor's check drawn on its general account. In some, but fewer, instances, the Bank gave its check to the supplier, carrier, etc.

**26.** Even on the Bank's theory and the most favorable theory of first-in, first-out, last-in, last-out, or a mixture of both, the Government would have a superior lien for $17,194.70 as this is the lowest credit balance of the Special Bank Account from July 27, 1961, to February 12, 1962.

in the * * * Special Bank Account" to the deposit and withdrawal of funds (Par. (2) Covenants, note 20, supra). This included the provisions for the maintenance of a Special Bank Account segregated from the general account of the Contractor (Par. 2, note 11, supra), the requirement that all deposits, both of advance payments and payments made under the substantive construction contracts be deposited in the Special Bank Account (Par. 2, note 11, supra), the requirement that withdrawals be only by countersigned checks (Par. 2, note 11, supra), the right of the Government on default to withhold further withdrawals (Par. 11, note 18, supra) and to exercise the right of withdrawal by check signed by the Government alone (Par. 11, note 18, supra).

█ We reject as untenable the the Bank's reading of Par. 2 of the Spebank covenants (note 20, supra) and find unhelpful or unneeded the canons of construction so forcibly pressed on us. To the Bank the phrase "the deposit and withdrawal of funds" (note 20, supra) in Spebank refers to the routine depository signature card with the traditional terms and conditions upon which deposits are received for collection. Not less than two things are wrong with this. The first is that on the Countersigning Agent's signature card the Government very carefully x-ed out all the fine print. Second, and more important, the "said contract" obviously refers back to those described in the Recitals (see note 19, supra, Par. (a) and (b) ) and no possible reference is made to any other contracts.

█ The canons of construction urged are interesting and although largely Texas-oriented we may assume that they would represent federal common law which clearly controls Government contracts. Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838. Royal Indem. Co. v. United States, 1941, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361; Free v. Bland, 1962, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180; Yiatchos v. Yiatchos, 1964, 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724; Bank of America Nat. Trust & Sav. Ass'n v. Parnell, 1956, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93; Security Life & Acc. Ins. Co. v. United States, 5 Cir., 1966, 357 F.2d 145.

█ Thus, while recognizing that two or more separate agreements executed contemporaneously are to be construed together, perhaps even as one instrument,[27] this does not mean that all are bodily consolidated into one instrument so that every provision in one instrument thereby becomes a part of every other instrument. Rather, each and all are simply to be read and construed together in order to arrive at the true intention of the parties to each of the instruments in construing the obligations imposed or assumed in each, but not necessarily all.[28] To this the Bank emphasizes the fact that Adpay was between the Government and Contractor alone and to which the Bank was neither a named party nor a signatory. The fact that Spebank expressly refers to Adpay does not mean that while each of the two should be construed in the light of the other, the Bank necessarily takes on the obligations of Adpay and becomes a party to it. A person is not made a party to a contract merely by being named and described in it or merely by the fact that such a contract is referred to in a second instrument in a way to evidence that such person is a party in another contract.[29] This is especially true if the parties are dif-

---

**27.** The Bank cites 10 Texas Jurisprudence, Contracts, § 166, p. 286.

**28.** The Bank stresses Government Personnel Mut. Life Ins. Co. v. Wear, Tex. Civ.App., 1952, 247 S.W. 284, affirmed, 151 Tex. 454, 251 S.W.2d 525; Williston, Contracts, 3rd Ed., § 628, p. 913, 914, 915.

In Wear the Court cites and quotes with approval from Huyler's v. Ritz-Carlton Restaurant & Hotel, D.Delaware, 1924, 1 F.2d 491, 492.

**29.** The Bank cites 10–A Texas Jurisprudence, Contracts, § 174, p. 351; 10 Texas Jurisprudence, Contracts, § 166, p. 288;

ferent, are not identical, or there is an absence of one or more significant elements of identity.[30]

We need not determine whether or to what extent these propositions are sound either for Texas or federal jurisprudence. For as with all canons, those pressed are aids to construction in searching out the intent of the parties, not inflexible mechanical rules inevitably committing the parties to a certain result merely from the scrivener's choice of particular words or techniques. The problem here is no different from any other interpretation of a single contract or a series of contracts: do the words used in the form and manner employed reveal what the parties must have intended? If the Court is substantially convinced that there is no doubt it needs no canons and the determination then made is one of law, not fact.

That is our position here as it was to the District Judge. When it is borne in mind that for all contracts, unambiguous or ambiguous, the construing court is to put itself in the position of the parties,[31] it is plain to us that all parties—and this includes the Bank —meant to import into Spebank and to bind all of its signatories to all of the

provisions of Adpay emphasized above [32] having a direct bearing on the deposit of funds into, and the withdrawal of funds out of, the Special Bank Account.

To begin with, Spebank leaves no doubt at all concerning what contracts are referred to in the Recitals. And for our purposes it matters not that courts and legal writers give voice to the rather strange statement that Recitals, even though plainly appearing within the body of an instrument, are not strictly any part of the contract.[33]

The function here of the Recital is to identify clearly the contract or contracts to which the Bank agrees expressly to be bound in the covenants. Thus subpar. (a) of the Recitals describes the contract by its exact date and name (see note 19, supra) and further states that a "copy of such advance payment provisions has been furnished to the bank." [34] And in subpar. (b) the Recitals get into specifics concerning the establishment of a Special Bank Account (see Sections 7 and 14(b) of Adpay, notes 13 and 11, supra). With such positive identification of Adpay and the categorical affirmation by the signatories that a copy had been furnished the Bank, the meaning of Par. (2) of the Covenants (note 20, supra) is clear.

17 C.J.S. Contracts § 58, p. 409; 17A C.J. S. Contracts § 346; Henderson v. Little, Tex.Civ.App., 1952, 248 S.W.2d 759 (writ ref'd n. r. e.) ; Miles v. Martin, 1959, 159 Tex. 336, 321 S.W.2d 62; Texas & N. O. R. R. v. City of New Orleans, 5 Cir., 1961, 292 F.2d 607, 611, upholding E.D.La., 1960, 185 F.Supp. 85, and E.D.La., 1958, 22 F.R.D. 84, 87.

30. The Bank urges Pittsburgh C. & St. L. Ry. v. Keokuk & Hamilton Bridge Co., 1888, 131 U.S. 371, 9 S.Ct. 770, 33 L.Ed. 157; Pittsburgh, C. & St. L. Ry. v. Keokuk & Hamilton Bridge Co., 1894, 155 U. S. 156, 15 S.Ct. 42, 39 L.Ed. 106; Positype Corp. of Amer. v. Mahin, 2 Cir., 1929, 32 F.2d 202.

31. Motor Vehicle Cas. Co. v. Atlantic Nat'l Ins. Co., 5 Cir., 1967, 374 F.2d 601, 605 and especially cases cited in n. 14 [Mar. 14, 1967, and cases in n. 14].

32. See notes 11 to 18, especially 11, 12, 13, and appended text.

33. See, e. g., as cited by the Government, Gardner v. Smith, Tex.Civ.App., 1942, 168 S.W.2d 278, 280, quoting at length from 17 C.J.S. Contracts § 314, p. 733; and also Wilson v. Towers, 4 Cir., 1932, 55 F.2d 199; Schaffran v. Mt. Vernon-Woodberry Mills, Inc., 3 Cir., 1934, 70 F.2d 963; Myers v. Gulf Coast Minerals Management Corp., Tex., 1962, 361 S.W. 2d 193.

34. This seems established as a matter of law as to the July 27, 1961 Adpay since before the meeting adjourned at the Air Force Contracting Office, the draft of Adpay was completed and signed by the signatories and made available to the Bank. As to the October 9, 1961 Adpay, however, there is a question whether the Bank received a copy until several days later. As a matter of law we regard this as immaterial. The Bank cannot plead ignorance of that which it solemnly represented it knew.

The references to the "said contract or contracts" obviously refers to Adpay. And in equally plain language it provides that the " * * * Bank will be bound by the provisions" of Adpay "relating to the deposit and withdrawal of funds in the * * * Special Bank Account." There were two ways for the Government to subject the Bank to those provisions. It could have restated them physically in Spebank or, as done here, expressly bind the Bank to those pertinent by incorporating them by reference.

To bind the Bank to those provisions, but no others, dovetailed nicely into the setting of the parties—the Government's need for security and the Bank's relation to Contractor and Government. The Bank could not have been expected to sign Adpay as such. It covered a host of responsibilities in no way related to the Bank or its function. Indeed, Par. (2) of the Covenants affirmatively recognizes the Bank's vital, but nevertheless limited, role. For it expressly recognizes that if the funds are withdrawn from the Special Bank Account by the countersigned checks (see Par. 2, note 20, supra) the Bank shall have no responsibility for the application of the funds. But this protection to the Bank emphasizes equally the critical requirement, and hence the articulate intention of the parties, that the Bank had no right either for its own benefit or that of anyone else to permit any funds to be withdrawn from the Special Bank Account except in accordance with the provisions of Adpay. And to cap it all, this is made doubly clear by the express provision for the lien under Par. (1) of the Covenants, (see note 21, supra) even though, in some respects, this might seem superfluous. But that the lien might have been superfluous strengthens, not weakens, the Government's position. Especially is this true in the light of the other portions of Adpay reflecting the Government's purpose to obtain contractually the highest and best security and certainly, as between it and the Bank, unquestioned priority. These included the lien on the Special Bank Account (note 14, supra), prohibition against assignments (note 15, supra), the warranty against existing assignments (note 16, supra), and the covenant against future assignments (note 17, supra).

By the plain terms of Spebank and those portions of Adpay expressly imposed on the Bank, the Government, as between itself and the Bank, had the absolute prior right to the balance in the Special Bank Account on February 12, 1962.

*B. Oral Agreement—Estoppel on COD's*

By the directed verdict, the Trial Court declined to submit to the jury the issue of whether there had been either an oral agreement, a waiver, or conduct amounting to estoppel. This ruling would encompass as well restrictive exclusions of some parol evidence thought to bear on this.[35]

We need spend little time on this because the proof in the record, construed most favorably to the Bank, reveals one thing sharply. On each occasion, July 27 and October 9, 1961, the discussions concerning COD's [36] was preliminary to or contemporaneous with the execution of Adpay, Spebank or both. Since the effect of the Bank's contention would be to (a) subordinate the Government's lien and position of a prior right to the funds in the Special Bank Account, (b) work a virtual assignment to the Bank of the basic Air Force construction contract, (c) give the Bank the right to withdraw funds from the Special Bank Account without countersigned checks, and (d) the right to reject the Government's withdrawal of funds on default by Government sig-

---

**35.** We would have much doubt that error is shown on this score since the proffer fails to show what the testimony would have been.

**36.** See note 25, supra.

nature only, the asserted oral agreement could not possibly have any legal vitality. For any one or more or all of these things categorically negate parallel provisions in Spebank and Spebank's partial absorbtion of Adpay. Each is expressly contradictory to and inconsistent with the parallel rights and obligations imposed in the written agreements. The oral agreement no matter how firmly it might be established as the truth can have no legal vitality. Snowden v. Franklin Nat'l Bank, 5 Cir., 1964, 338 F.2d 995.[37]

■ Even if we view it from a time subsequent to the execution of the contracts, the evidence received or proffered of conduct by the Bank and the Government fails to raise a question of waiver or estoppel. Again indulging every inference in favor of the Bank, the evidence showed nothing more than this. The Bank on a number of occasions honored overdrafts on the Contractor's general checking account for COD items, including occasionally payroll checks. On others, less frequent, the Bank gave its own check to the creditors. In all of these instances save those representing the unreimbursed total of $69,318.82 the Government subsequently countersigned checks drawn on the Special Bank Account to reimburse the Bank for its direct payments and to reimburse the Contractor for those paid by checks on its general account.

■ Waiver and estoppel fail for a number of reasons. Probably foremost is the total absence of any proof proffered or received showing that the particular Government employees handling such transactions had authority, even if they knew all of the underlying facts, either to waive the precise terms of Adpay, Spebank, or both, or affirmatively to commit the Government to new obligations. But equally decisive, the handling of these payments in this fashion is not at odds with, contradictory to, or in conflict with the terms of Spebank, Adpay, or both. Although the funds in the Special Bank Account could be withdrawn only for the "purposes of making payments for direct materials, direct labor, and administrative and overhead expenses required" for the First and Second Contracts, there was no requirement in either Adpay or Spebank that the payments be direct from the Special Bank Account to the supplier of the materials or services. So long as the Contractor could demonstrate to the satisfaction of the specified Government officers that the funds requested were for direct materials, labor and administrative expense already incurred, it was quite in order for a countersigned check to be drawn on the Special Bank Account payable to the Contractor for reimbursement of its earlier payments for those direct costs or to the Bank for funds advanced by it in the Contractor's acquisition of these direct cost items. Such an operation was entirely consistent with the whole concept of this financing-security arrangement. To the knowledge of the Contractor and the Bank, the funds on deposit in the Special Bank Account were available for the reimbursement of items provided they met the direct characteristic. But until the appropriate Government contracting officer was satisfied that the items were reimbursable as direct costs, the Government, armed also with its superior lien and security interest, retained the sole power over the disposition of the Special Bank Account. By the Bank's handling the transactions in this fashion, there was nothing to indicate that the Bank was either claiming or had any possible right to claim that it was entitled to charge either or both

---

37. In *Snowden*, appellant alleged that "the note, although purporting to bind him, was actually executed because he was assured that the corporation, the recipient of the funds under his note, had adequate collateral, and that he would never be held personally accountable. * * * Under the familiar accepted Texas principles, this parol evidence would not be admissible because it negates the very obligation of the writing." See 3 Corbin, Contracts § 583 (1960); Restatement, Contracts §§ 237, 240(1) (1932).

of these types of items against the Special Bank Account.

The Bank, therefore, had no defense to the Government's demand either on the contract or on conduct.

## III.

### Bank's Counterclaim

The Bank by counterclaim asserted in two counts a claim for (a) the $69,-318.82 and (b) one in the nature of damages in the sum of approximately $169,000 for breach of the Government's obligations to the Bank. As to (a) nothing further need be added to what we have said. The Bank fails on contract, conduct, or both either as a defensive measure or an affirmative recovery. As to (b), the Bank, as near as we can understand it, asserts that it suffered this much damage because the Government failed to live up to its express or implied obligation to use advance payments in the Special Bank Account to pay for the spare parts being delivered under the First Contract.

The Government urged below and renews here with great and customary vigor its contentions that the Court was without jurisdiction because the amount sought far exceeded the $10,000 limit of the Tucker Act, 28 U.S.C.A. § 1346(a) (2), and because the proof finally failed to show compliance with 28 U.S.C.A. § 2406 permitting setoff, not affirmative recovery, only if the claim has been disallowed in whole or in part by the General Accounting Office. We need not undertake to resolve this always ticklish problem in the application of counterclaims, permissive or compulsory, F.R.Civ.P. 13(d). See, e.g., United States v. Springfield, 5 Cir., 1960, 276 F.2d 798, 803; and see 3 Moore's Federal Practice, #13.28, p. 75–76, also #13.26, p. 66–68 (2d ed., 1966). Nor need we determine whether the Bank, to avoid the $10,000 maximum limitation, may treat each shipment of spare

parts arising under a single contract as a separate claim. All these we avoid because again on the intrinsic merits, there is not the slightest whisper of a possibility of a valid claim *by the Bank* [38] against the Government for the asserted breach.

■■■■■ The Bank's claim for damages so far as we can discern it is the dual one that (a) the Bank's relinquishment of its 1959 assignment of the First Contract contemplated that the advance payments would be used to finance the spare part deliveries, and (b) no payment was ever made for the spare parts. We fail to see any possible basis for reading (a) into the Bank's letter of September 15, 1961, expressly waiving earlier 1959 assignment of the First Contract to it (see note 22, supra). But even if it were, this is of no help to the Bank. As Assignee of the First Contract, it is still bound by its terms and the record reveals that the First Contract required that progress payments (see note 7, supra) be deducted from payments for materials and equipment delivered by the Contractor to the Government. Moreover, once it is determined, as we have held, that through Spebank the Bank is bound to the terms of Adpay concerning deposits in and withdrawals from the Special Bank Account, it is clear that the Government was quite within its rights in making payments for spare parts or other materials delivered by checks which were to be deposited in the Special Bank Account for whatever amount might then be due under the appropriate First or Second Contract less whatever deductions that were permitted or required. Although the Bank perhaps proved that there was never any cash (or check) for as much as a single cent covering the agreed contract prices for spare parts delivered, the record is equally positive that, by appropriate credits, the payments for spare parts delivered were actually made.

---

**38.** We emphasize again that we are discussing the Bank's right alone. Whatever rights the Contractor or the Trustee in

bankruptcy might have is in no way resolved here. See note 24, supra.

The Trial Court was therefore quite correct in dismissing the counterclaims of the Bank.

### IV.

### The Trustee's Appeal

█ Having been brought into the case by the Bank's third party complaint, the Trustee asserted a claim to the entire $129,183.23 balance of the Special Bank Account, although in three bites, (1) the $38,480.41 paid by the Bank to the Government, (2) the $21,384 paid to Internal Revenue Service on the tax levies, and (3) the balance of $69,-318.82 claimed by the Bank and Government. Unlike the usual strong arm demands for everything plus, the Trustee does not deny the priority of the Government, or probably the Bank, over general creditors. All the Trustee seeks is the administration of these funds to effectuate the priority of administration expense and certain priority wage claims under § 67(c) (1), 11 U.S.C.A. § 107(c) (1).[39] The Trustee, therefore, has to establish that the liens of the Government were (a) statutory and (b) that at the time of bankruptcy the Government did not have possession of this personal property (Special Bank Account).

As it did with respect to the Bank's counterclaims, the Government urges strongly that the District Court lacked jurisdiction over these claims.[40] And as before, we find it unnecessary to resolve this matter.[41] Especially is this a desirable course since it is conceivable that even though jurisdiction against the Government is lacking, the Trustee might still get from the Bank the amount ($69,318.82) held by it since this would not be a decree against the Government. Consequently, it is appropriate that the claim be determined on its merits.

The Trustee's theory is twofold. First, he reasons that the Government's contractually reserved lien (Covenant 1, Sepbank, Par. 8 Adpay, notes 21 and 14, supra) is really "statutory" within § 67(c) (1) since without the statutory declaration that the Government's "lien is paramount to any other liens," 10 U.S.C.A. § 2307 (see note 5, supra), this non-possessory equitable lien would have been vulnerable as to creditors, and hence to the Trustee under strong arm provisions of the Bankruptcy Act. §§ 60, 70c, 11 U.S.C.A. §§ 96, 110c. Consequently, it is a "statutory" lien. Second, the "non-possession" factor is satisfied by the formal stipulation.[42]

---

**39.** "Where not enforced by sale before the filing of a petition initiating a proceeding under this title, and except where the estate of the bankrupt is solvent:

(1) though valid against the trustee under subdivision (b) of this section, statutory liens, including liens for taxes or debts owing to the United States or to any State or any subdivision thereof, on personal property not accompanied by possession of such property, * * * shall be postponed in payment of the debts specified in clauses (1) and (2) of subdivision (a) of section 104 of this title * * *."

The provisions of 11 U.S.C.A. § 107(c) have been substantially modified since the commencement of this litigation. See 11 U.S.C.A. § 107(c) (Supp.1966); Pub.L. 89–495, 80 Stat. 268 (July 5, 1966).

**40.** Contending that 11 U.S.C.A. § 46 is insufficient to invest jurisdiction, the Government cites: United States v. Shaw,

1940, 309 U.S. 495, 60 S.Ct. 659, 84 L. Ed. 888; United States v. United States Fid. & Guar. Co., 1940, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894; Nassau Smelting & Refining Works v. United States, 1924, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190; Danning v. United States, 9 Cir., 1958, 259 F.2d 305; In re Greenstreet, Inc., 7 Cir., 1954, 209 F.2d 660.

**41.** We do, however, sustain it as to the tax levies, infra.

**42.** "31. That the funds referred to in Stipulations 23, 24, 27 and 30 [the amounts paid by the Bank on tax levies, paid to the Government, ($38,480.41) and withdrawn by the Bank ($69,318.82)] relate to statutory liens for taxes and for debts owing to the United States, and which said funds were in the "actual possession" of the Defendant Bank on February 28, 1962."

■ On both scores we think the District Judge was correct. The stipulation did not mean to foreclose judicial determination of the "possession." It established only the physical fact that money was on deposit at the Bank, and nowhere else. After February 12 the Bank under Adpay and Spebank had no right of control or direction. The Government had the sole control and direction. At that stage the Bank was nothing more than the Government's agent as to the funds on deposit in the Special Bank Account.

■ But whatever doubt there might be on this score, there is none as to the asserted statutory character of the lien. The District Judge was right when she relied on the teachings of In re New Haven Clock & Watch Co., 2 Cir., 1958, 253 F.2d 577, and the standard defining a statutory lien as one arising "primarily from an economic relationship defined by the legislature," Id. at 582 citing 4 Collier, Bankruptcy 184 (14th ed. 1964). The Contract (Spebank) gives rise to the Special Bank Account. The Contract gives rise to the lien. The Contract prescribes that it is superior and paramount. The statute (10 U.S.C.A. § 2307), to be sure, provides that such a contractually created superior lien shall be paramount against all other parties. But neither the controlling standard nor the objectives [43] of § 67(c) (1) (note 39, supra) make this out to be a statutory lien.

■ This leaves only the Trustee's claim for the $21,000 tax levies. As to this we do not pass upon the merits since United States v. Rochelle, Trustee, 5 Cir., 1966, 363 F.2d 225 [No. 22046, July 7, 1966], holds flatly that no jurisdiction exists as to a suit of this nature by the Trustee to recover monies actually covered into the Treasury. The painstaking opinion by Judge Waterman— painstaking not only in the careful exploration of every conceivable way to find jurisdiction, but also painstaking in the evident sense of trying to find an escape from a painfully unfortunate result [44]—closes all of the doors to the District Court.

Affirmed.

---

43. The objectives of this legislation are well stated by Collier:

"Notwithstanding the long established bankruptcy principle that valid liens should be enforceable in their entirety as against general, unsecured creditors and those entitled to priority the realization developed that state-created statutory liens, like state priorities to the extent they are recognized in bankruptcy run counter to the underlying objective of equitable distribution of the debtor's assets among all his creditors. As a result of long inaction of tax authorities, liens for taxes which had accumulated over a number of years often consumed a very substantial portion of an estate and indeed the whole estate if not large. * * * This situation was further aggravated in the later years * * * by the growth of special legislation favoring public and private claims by granting liens to secure them." 4 Collier, Bankruptcy ¶67.20, p. 189 (14th ed. 1964). See also City of New Orleans v. Harrell, 5 Cir., 1943, 134 F.2d 399, 401.

44. This echoes, perhaps, the sentiments recently expressed by his Brother Friendly:

"The compulsion felt by my brothers * * * to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observation as to the occasional predilection of the best of judges for 'a strong decision,' to wit, one 'opposed to common sense and to common convenience.' * * *." Spanos v. Skouras Theatres Corp., 2 Cir., 1966, 364 F.2d 161, 167.