**BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN, its lodges, officers and employees thereunder, Appellant,**

v.

**CENTRAL OF GEORGIA RAILWAY COMPANY and Southern Railway Company, Appellees.**

**No. 23815.**

United States Court of Appeals Fifth Circuit.

May 2, 1969.

---

Ralph L. Crawford, John R. Calhoun, Savannah, Ga., Harold C. Heiss, Donald W. Bennett, Heiss, Day & Bennett, Cleveland, Ohio, Alex Elson, Aaron S. Wolff, Elson, Lassers & Wolff, Chicago, Ill., for appellant.

John B. Miller, Julian C. Sipple, Savannah, Ga., Wilbur D. Owens, Jr., Charles J. Bloch, Macon, Ga., James H. Wilson, Jr., Clay C. Long, Atlanta, Ga., for appellees; Hitch, Miller, Beckmann & Simpson, Lawton, Sipple & Chamlee, Savannah, Ga., Bloch, Hall, Groover & Hawkins, Macon, Ga., Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and GOD-BOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

### MERITS

This controversy had its genesis in Germany in 1858 when Rudolf Diesel was born. The engine which was later named after this noted automotive engineer revolutionized the conversion of chemical to mechanical energy. His small, efficient engine was quickly adopted by industry and is today found on all the highways and railroads of this country and throughout the world. And therein lies the rub. When the Nation's railroads started using the diesel engine, they stopped using the steam locomotive's firemen, or so they thought. Since diesel fuel need not be shoveled, and the diesel fire need not be tended, the coal-shoveling, fire-tending firemen of the nineteenth century were soon to become superfluous.

They are a strong and powerful lot, however, and are vigorously represented on the National front by the Brotherhood of Locomotive Firemen and Enginemen (BLFE) in their struggle with the railroads to perpetuate their use on diesel locomotives. This basic confrontation between men and technology has locked this Nation in one of the longest and most bitterly fought labor disputes in the country's history. Courts across the land have been struggling with this clash of interests with little, if any, success but with an experience-proved recognition that the "genie cannot be put back into the bottle" Op. [1] 600.

We have here but a small and wholly unnecessary portion of this running controversy. By drawing freely on Judge Leventhal's monumental opus in the *merits* opinion for the District of Columbia Circuit as well as the related

*contempt* decision we may severely capsulate the facts with the caveat that the details, if needed, may be found there.[1] Additionally, some of the details come out in our contempt decision reversing the criminal contempt decision of BLFE.[2]

Not surprisingly, the contemporary dispute arises out of a settlement of the irrepressible controversy. The problem began when the Carriers and BLFE voluntarily entered into the National Diesel Agreement in 1950, providing that firemen should be employed on substantially all locomotives. In 1959, the Carriers filed a § 6 notice pursuant to the Railway Labor Act (45 U.S.C.A. § 156) in an attempt to eliminate firemen from certain locomotives. After numerous attempts at mediation and conciliation, and on the eve of a threatened nation-wide railway strike, Congress in 1963 enacted Public Law 88–108 (77 Stat. 132) which required transitory compulsory arbitration and set up Special Arbitration Board No. 282. The Arbitration Board promulgated Award 282 in November 1963, which made sweeping orders concerning the use of firemen on locomotives (and some "crew consist" problems not involved here). As permitted under the enabling Act (P.L. 88–108) by agreement between the Carriers and BLFE, the expiration date of Award 282 was fixed at 12:01 a. m., March 31, 1966. But the two-year period did not bring the hoped-for peaceful solution nor did it precipitate hoped-for bargaining, just more litigation and as the expiration date approached, all sorts of skirmishes by which the adversaries hoped the expiration might bring more advantageous positions than would bargaining. The "legal" argument centered about the Brotherhood's contentions that Award 282 expired fully and finally on E-day, and the Carriers' reflex claim that Award 282 endured until changed by the parties. (See Op. [1] p. 592).

In November 1965, in anticipation of the expiration of the Award, BLFE served three separate § 6 notices on the Carriers, proposing a new agreement concerning the use of firemen.[3] The Car-

---

1. For ease of reference we mark these as opinions [1] [2], etc. with specific reference abbreviated, e. g., Op. [1] p. 601:

    Opinion [1] (Merits):
    Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R. R., 1967, 128 U.S.App.D.C. 59, 385 F.2d 581, cert. denied, 1968, 390 U.S. 923, 88 S. Ct. 851, 19 L.Ed.2d 983.
    Opinion [2] (Contempt):
    Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R. R., 1967, 128 U.S.App.D.C. 59, 380 F.2d 570, cert. denied, per curiam, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560. The Court vacated its prior order denying certiorari and entered a new order denying the writ on the ground that the case was not yet ripe. Mr. Justice Black would have granted the petition.
    Opinion [3] (Union Representation):
    Brotherhood of Locomotive Firemen and Enginemen v. National Mediation Board; and National Mediation Board v. Brotherhood of Locomotive Engineers (No. 22185), D.C.Cir., 1969, 410 F.2d 1025. This sequel concerns the internecine, intramural, probably non-fraternal dispute between the two Brotherhoods as to which gets the Apprentice Engineer craft and the dilemma facing the Carriers in recognition and bargaining. With the collective apologia of the Court's principal spokesman Judge J. Skelly Wright, and special sentiments of Judges Burger and Tamm, the Court may itself be giving its decision the characterization that it is bound to be right because it is so wrong in result. See Gulf Oil Corp. v. Panama Canal Co., 5 Cir., 1969, 407 F.2d 24, 26; Lawrence v. United States, 5 Cir., 1967, 378 F.2d 452, 467.

    To add to the confusion, this may put The D.C. Circuit in conflict with the Sixth's opinion. See Brotherhood of Locomotive Firemen and Enginemen v. Louisville and Nashville R. R., 6 Cir., 1968, 400 F.2d 572, cert. denied, 393 U.S. 1050, 89 S.Ct. 689, 21 L.Ed.2d 692; cited note 5, D.C. Op. [3].

2. Brotherhood of Locomotive Firemen and Enginemen v. United States, 5 Cir., 1969, 411 F.2d 312 this day decided.

3. The notices are described in Op. [1] p. 600:
    "Notice No. 1 related to the types of engine services on which the employment of firemen would be required, and

riers made the double track contention that the Notices were premature and that No. 2 and No. 3 were not even proper subjects for bargaining.[4] But not to be outdone they made "just in case" (Op. [1] p. 592) § 6 notices. BLFE and the Carriers were unable to reach agreement. On March 24, 1966, the Nation's Class I railroads filed suit in the United States District Court for the District of Columbia[5] seeking declaratory and injunctive relief. On March 28, 1966, Judge Holtzoff, of that Court, issued a temporary restraining order against BLFE prohibiting a strike upon the expiration of the Award. At 12:01 a. m. on March 31, 1966, BLFE initiated a strike against the Central of Georgia (Georgia Central) and other railroads. Southern was affected in that some of its personnel would not cross the Georgia Central picket lines. Later on March 31, Judge Holtzoff expanded his restraining order to cover any strikes in any way relating to the Award. (Op. [2] p. 574) On the same day, Georgia Central and Southern sought injunctive relief against BLFE in the United States District Court for the Southern District of Georgia. The District Court in Georgia also issued a temporary restraining order on March 31, 1966.

It rounds out the picture to state here that the strike was terminated on late Sunday April 3, 1966. (Op. [2] p. 574) And nothing except the Georgia criminal contempt proceeding of April 4, (See note 2) is shown by our record to have taken place in the Georgia case down to about May 12 to 16. But much was taking place under Judge Holtzoff's direction with full relief being accorded the Carriers both as to the there-pending

civil-coercive contempt[6] and the merits. (Op. [1] pp. 592, 600.) On May 12, 1966, Judge Holtzoff entered a judgment in accordance with his opinion in Bangor and Aroostook R. R. Co. v. Brotherhood of Locomotive Firemen and Enginemen, D. C., 253 F.Supp. 682 permanently enjoining BLFE and each of its lodges, divisions, locals, officers, and agents, and all persons acting in concert with them from engaging in any strikes or work stoppages or from picketing the premises of any of the railroads with respect to the failure or refusal of any carrier to confer, bargain, negotiate, participate in mediation or otherwise participate in proceedings under the Railway Labor Act with respect to Notice Nos. 1 and 2 or the failure or refusal of any carrier prior to the expiration of the Award to confer, bargain, negotiate, or participate in mediation with respect to Notice No. 3.

Without the slightest whisper of a suggestion of a remote possible reason why, with the strike terminated and the threat of all renewed action being positively enjoined by Judge Holtzoff's final order of May 12, the Georgia District Court on May 16 entered a preliminary injunction dated May 12 (F.R.Civ.P. 79(a)) which is the subject of this appeal. Except that it zeroed in for local railroads against localized Brotherhood representatives it was a virtual ditto of Judge Holtzoff's. It enjoined BLFE, and each of its lodges, divisions, locals, officers, and agents, from authorizing, calling, encouraging, permitting or engaging in any strike or work stoppage against Georgia Central or Southern and from picketing the premises of either Georgia Central or Southern in a resumption of the strike against Georgia Central which commenced March

---

would have pegged employment at a level of 6000 jobs below the terms of the National Diesel Agreement, but far above the level provided by Award 282. Notice No. 2 provided for compensation to firemen who had been relocated, severed, or otherwise disadvantaged by the operation of Award No. 282. * * * Notice No. 3 * * * set out a training program for apprentices."

4. By stipulation the validity (but not the timing) of No. 3 was deferred in the D.C. litigation. Op. [1] p. 600.

5. This case, Bangor & Aroostook, No. 20316, is the lead citation to the contempt case, Op. [2] note 1 *supra*, but that Declaratory proceeding and order was the precise subject of the merits case. Op. [1] pp. 592, 599 and n. 38.

6. See Op. [2] pp. 574–75.

31, 1966, or over any dispute as to the effect of the expiration of Award 282 or over any dispute arising out of any of the proposals served by BLFE on the Carriers.

The Brotherhood appeals from this preliminary injunction of May 16, 1966, with two principal attacks. The first is the procedural one complaining of duplicate litigation in both Georgia and the District of Columbia. The second goes to the merits including the validity of the § 6 notices and the prohibitive effect of the Norris-La Guardia Act.[7]

▇ We need not consider the second group on the merits (see items 2 through 7, note 7 *supra*) for two reasons. The first is that, for reasons to be discussed, we get this case out of Georgia, where it never should have been, by sending whatever remains of the case to the D.C. District Court. Second, both Georgia Central and Southern were and are formal parties to the D.C. litigation. Each is irretrievably bound as to every issue determined by that Court and the Court of Appeals for the District of Columbia. This includes, among others, the timeliness of the § 6 Notices 1, 2, and 3 and the validity of Nos. 1 and 2 (Op. [1] pp. 597, 599, 600–603), and the application of the Norris-LaGuardia Act both as to § 4 and § 8 (Op. [1] pp. 600–604, 613–614).[8]

As we dispose of this case we do not have to assay the actions in terms of the initial restraining order of March 31 (which was a parallel of Judge Holtzoff's of the same day). We concentrate on the preliminary injunction entered May 16.

Nothing illustrates better the utter uselessness of this entire proceeding than the Carrier's complaint filed in the District Court in Georgia. "This matter was litigated before the Honorable Alexander Holtzoff, United States District Judge, District of Columbia, in the case of Bangor and Aroostook Railroad Co., et al versus Brotherhood of Locomotive Firemen and Enginemen, C.A. 777–66. He held with the railroads and by order dated March 28, 1966, restrained and enjoined defendants from causing a work stoppage. A copy of the pertinent part of said order is attached hereto, marked Exhibit 'A'." More than that, the Carriers recognized the binding character of Judge Holtzoff's order and its nation-wide application to the Brotherhood and all of its components and agents.[9]

7. Just for completeness we set them out as does the Brotherhood's brief:

"C. Issues Presented.

1. Where an action is pending and being diligently prosecuted in a United States District Court, may the same plaintiffs prosecute a second action against the same defendants for the same relief before another United States District Court?

2. Is a Section 6 notice under the Railway Labor Act, which is totally unrelated to an arbitration award, premature merely because it is served prior to the expiration of such award?

3. Is a Section 6 notice under the Railway Labor Act requesting a training program for apprentice firemen bargainable at the request of a union which is the duly authorized collective bargaining representative for firemen?

4. Were the conferences with respect to the Section 6 notice terminated so as to permit the union to resort to self-help under the Railway Labor Act?

5. Did the Norris-LaGuardia Act deprive the district court of jurisdiction to enjoin the strike?

6. Did the railroad's refusal to bargain bar them from injunctive relief under § 8 of the Norris-LaGuardia Act?

7. Did the Southern Railway have standing to complain about a strike alleged to concern the expiration of an arbitration award when that carrier was not a party to the award and was not struck or picketed by the union, but was affected only by picketing at a common situs with the Central of Georgia Railway?"

8. Validity and bargainability of Notice No. 3 (note 3 *supra*) were left open by stipulation. Obviously, the District of Columbia Court should decide these along with all remaining issues, if any.

9. The Georgia complaint continued:

"On information and belief, plaintiffs show that despite said injunction of Judge Holtzoff, which is binding on all of the defendants herein, said defendants have, in violation of said Court decree and in violation of the

Thus the Georgia District Court was on March 31, fully aware of the existing temporary restraining order of March 28, and the supplemental order of March 31, issued by Judge Holtzoff. And with all of the "crises" now long out of the situation the lower court knew specifically of Judge Holtzoff's permanent injunction of May 12. In spite of this, the District Court of Georgia proceeded to issue duplicative restraining orders and finally the preliminary injunction enter-ed May 16. Both sets of temporary restraining orders and injunctions prohibited precisely the same parties from engaging in precisely the same activities and protected precisely the same railroads. The jurisdiction of the United States District Court for the District of Columbia having been invoked by these very parties out of this very controversy and the decrees of that Court having issued, that is the only place where the case then properly belonged.[10]

Railway Labor Act, conspired to evade and defy said Court decree and without any notice have, acting in concert, unlawfully stopped work and instituted a strike or work stoppage * * *."

The exhibit referred to in the complaint recited that BLFE and all of its employees were temporarily restrained from engaging in any "strikes or work stoppages and from picketing the premises of any of the plaintiffs over any dispute as to the agreements, rules, regulations, interpretations, or practices to be applied by plaintiffs or any of them upon the expiration of the period during which the Award by Arbitration Board No. 282 shall continue in force as an award * * *."

10. Judge Maris, speaking in 1941 in terms of then expanding Court dockets, again revealed both his remarkable wisdom in court administration problems and his prescience in predicting what has since become a real explosion of judicial business. In Crosley Corp. v. Hazeltine Corp., 3 Cir., 1941, 122 F.2d 925, 929–930, cert. denied, 1942, 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211 he wrote for the Third Circuit:

"It was long ago laid down by Chief Justice Marshall as a salutary rule that 'In all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it.' Smith v. McIver, 9 Wheat. 532, 535, 22 U.S. 532, 535, 6 L.Ed. 152. It is of obvious importance to all the litigants to have a a single determination of their controversy, rather than several decisions which if they conflict may require separate appeals to different circuit courts of appeals. * * * The economic waste involved in duplicating litigation is obvious. Equally important is its adverse effect upon the prompt and efficient administration of justice. In view of the constant increase in judicial business in the federal courts and the continual necessity of adding to the number of judges, at the expense of the taxpayers, public policy requires us to seek actively to avoid the waste of judicial time and energy. Courts already heavily burdened with litigation with which they must of necessity deal should therefore not be called upon to duplicate each other's work in cases involving the same issues and the same parties."

The Supreme Court has put its imprimatur on these principles. "To permit a situation in which two cases involving precisely the same issue are simultaneously pending in different District Courts leads to * * * wastefulness of time, energy and money * * *. Moreover, such a situation is conducive to a race of diligence among litigants for a trial in the District Court each prefers." Continental Grain Co. v. Barge FBL–585, 1960, 364 U.S. 19, 26, 80 S.Ct. 1470, 1474, 4 L. Ed.2d 1540, 1961 A.M.C. 1, affirming 5 Cir., 1959, 268 F.2d 240, 1960 A.M.C. 249.

Of course, dockets, both trial and appellate, continue to expand beyond the capacity of increased judge power. See the report, Director of the Administrative Office of the United States Courts (July-December 1968) at 6, and bearing on the Fifth Circuit see, Peters v. Rutledge, 5 Cir., 1968, 397 F.2d 731, 738, note 22. This problem is developed at length with detailed data concerning the Fifth Circuit in the Senate Report of Hearings on the Operation of Procedures for the Temporary Assignment of Federal Judges, 1968, before the Subcommittee on Improvements in Judicial Machinery, 90th Cong., 2nd Sess., at 64–80 (1968); testimony and statement of the Chief Judge with supporting exhibits, Crisis in Courts of Appeals, at 80–84 (1968); and remarks of Senator Tydings, Chairman, October 8, 1968, 114 Cong.Rec.S. 12237–12239. Groendyke Transport,

■ We need not expressly determine whether in these circumstances the District Court erred in failing to grant BLFE's motion to dismiss on the ground of the pendency of the same case in the District of Columbia. This is because we hold that, as a minimum, the Trial Court should have transferred this case under 28 U.S.C.A. § 1404(a) to the D.C. Court. We achieve what ought to have been done three years ago by remanding with directions to transfer.

The Carriers here are the last ones able to challenge any such procedure for that is precisely how Georgia Central and Southern (and their cohort Carriers) got the controversy before Judge Holtzoff. The litigation concerning the consequences of the expiration of Award 282 and the § 6 notices was initiated in February 1966, by BLFE's suit filed in the United States District Court for the Northern District of Illinois. The Carriers moved to transfer the action to the District of Columbia on the ground that there was a prior action pending in the District of Columbia, brought by the Carriers against the other operating unions involved in Award 282.[11] The District Court in Illinois granted that motion.

We concur in the wisdom of that transfer and therefore in the interests of justice we direct on remand that this whole cause be transferred[12] to the District of Columbia Court.

Just what remains of the case, what issues are still alive, what issues have already been resolved irrevocably under *res judicata*, collateral estoppel or both, by the prior decisions of the Courts in the District of Columbia Circuit (see note 1 *supra*) to which Georgia Central and Southern are bound as parties are matters for the determination of the transferee court and its Circuit Court of Appeals.

Judgment vacated and remanded with directions.

Inc. v. Davis, 5 Cir., 1969, 406 F.2d 1158, 1161 n. 6; Murphy v. Houma Well Serv., 5 Cir., 1968, 409 F.2d 804, 805 n. 5.

It is significant that the Southern District of Georgia has the *second* highest weighted caseload in the nation and the Judicial Conference of the United States has recommended (and now does recommend) additional judgeships. Report, Judicial Conference of the United States (1968) and Annual Report of the Director of the Administrative Office of the United States Courts (1968) at 50, 124.

11. As a legal scrivener, judge or lawyer would have a hard time improving on the language which Georgia Central and Southern through their spokesmen used to induce transfer from Chicago to Washington, D.C. Their motion to transfer stated:

"10. The convenience of the parties, the interests of justice and the public interest would be better served by transfer of this cause in that if this Court retains the case, the same controlling legal question will be decided by two separate District Courts. The legal questions involved are of such grave import not only to the parties but to the public because of its dependence on continuity of rail transportation that consolidation and uniformity of re-

sult and the avoidance of multiplicity of litigation would appear to be essential.

"11. The convenience of the parties and the interests of justice will better be served by transfer of this cause since a transfer will prevent the waste of time, energy and money; it will protect the litigants, possible witnesses and the public against unnecessary inconvenience and expense. In these respects a transfer will not only permit one trial court proceeding involving all five of the railroad operating unions but it will also avoid duplicative appeals in two federal circuits."

12. For a general discussion of the purposes to be served by section 1404(a), see Van Dusen v. Barrack, 1964, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945. See also Koehring Co. v. Hyde Const. Co., 1966, 382 U.S. 362, 86 S.Ct. 522, 15 L.Ed.2d 416 (transfer by Court of Appeals); Akers v. Norfolk and Western Ry., 4 Cir., 1967, 378 F.2d 78, 80 (discretion of Judge); A. Olinick & Sons v. Dempster Bros., Inc., 2 Cir., 1966, 365 F.2d 439, 445 (crowded docket); Koehring Co. v. Hyde Const. Co., 5 Cir., 1963, 324 F.2d 295, 296 (public interest). See also 28 U.S.C.A. § 1407, Multi-district Litigation, as a new tool for saving precious judge time.